Argued December 4, 1978, affirmed February 13,
petition for rehearing denied March 13, 1979

MORSE et al, *Respondents,*
*v.*
OREGON DIVISION OF STATE LANDS et al,
*Petitioners.*
(CA 10946, SC 25912)

590 P2d 709

Peter S. Herman, Senior Counsel, Salem, argued the cause for petitioner Division of State Lands. With him on the brief were James A. Redden, Attorney General, Walter L. Barrie, Solicitor General, and James C. Rhodes, Deputy Attorney General, Salem.

Donald J. Morgan, of Wood, Tatum, Mosser, Brooke & Holden, Portland, argued the cause and filed a brief for petitioner City of North Bend.

G. Jefferson Campbell, Jr., of Newhouse, Foss, Whitty & Roess, Coos Bay, argued the cause and filed a brief for petitioner Western Bank.

George T. Gant and Ronald L. Gould, of McNutt, Gant & Ormsbee, Coos Bay, filed a brief for the Port of Coos Bay as amicus curiae.

Bruce H. Anderson, of Coons & Anderson, Eugene, argued the cause and filed a brief for respondents.

HOLMAN, J.

Howell, J., concurred in the result and filed opinion in which Lent and Linde, J.J., joined.

Bryson, J., concurred and filed opinion.

## HOLMAN, J.

The issue in this case is whether the Director of the Division of State Lands had authority to issue an estuarian land fill permit. The Court of Appeals held that the Director lacked authority to issue the permit, 34 Or App 853, 581 P2d 520 (1978). This court granted the Director's petition for review.

Pursuant to Oregon's fill and removal law, ORS 541.605 to 541.665, the City of North Bend filed with the Division of State Lands an application for a permit to fill 32 acres of Coos Bay for the purpose of extending a runway at its municipal airport. The permit was granted and respondents, as persons claiming to be adversely affected by the proposed fill, requested a contested hearing. Following the hearing, the Director granted the application on the condition that the City mitigate the loss of estuarial resources by removing an old spoil island adjacent the permitted fill. Respondents sought judicial review and the Court of Appeals reversed, holding that the order was inconsistent with the Division's administrative rule requiring that land-fill projects be for a water-related purpose. *Morse v. Division of State Lands,* 31 Or App 1309, 572 P2d 1075 (1977), rev. denied, 281 Or 431 (1978). The parties are in agreement that the airport extension is not for a water-related use.

Thereafter, the Director, by temporary rule, removed from the administrative regulations of the Division the requirement that fills be for a water-related activity.[1] The City then renewed its application for the fill and, following a hearing on the permit

---

[1] Former OAR 141-85-205(6) provided:
  "Applicants for fill projects must show that the land to be created will be used for a water-related activity * * *."
As amended by temporary rule, the rule now provides:
  "(6) Applicants for fill projects must show:
  "(a) How much fill is necessary to accomodate the proposed use.
  "(b) How the land created will be used.
  "(c) Whether or not the project has significant public benefit.

in which the respondents participated, the Director issued a final order granting the renewed application. The testimony was largely that which had been taken pursuant to the previous application, and certain of the findings of fact made upon the first application were incorporated in the findings upon the second application. The Director found that the fill would reduce the water surface area and tidal prism of the Coos Bay estuary, that it would displace clams as well as other organisms and would eliminate some casual navigation of the recreational kind.

In an attempt to mitigate the harm to the estuary caused by the fill, the Director ordered the City to return certain diked submersible lands to the tidal influence rather than requiring a removal of the spoil island as directed on the first application. Respondents again appealed and the Court of Appeals held that the permit was beyond the authority of the Director because the public trust doctrine was intended to be incorporated into the statute and that the doctrine prohibited fills for non water-related uses. The opinion left open the question of whether the legislature has authority to modify the public trust doctrine. We granted review.

■ We agree that it is unnecessary to decide whether the legislature has authority to impinge upon the *public trust* doctrine but for a different reason than that given by the Court of Appeals. Contrary to that of the Court of Appeals, our conclusion is that the doctrine does not prohibit other than water-related uses in situations like the present one. Limitation

---

"(d) Whether or not filling is necessary to carry out the proposed activity.

"(e) Whether or not the proposed use is consistent with existing land use plans.

"The purpose of this section is to make additional information on fill projects available to the Director and reviewing parties and is not intended to be a limitation on the Director's authority to issue fill permits."

upon the power of the state to permit alienation of the use of its waters is discussed in *Shively v. Bowlby,* 152 US 1, 14 S Ct 548, 38 L Ed 331 (1894), and *Illinois Central Railroad v. Illinois,* 146 US 387, 13 S Ct 110, 36 L Ed 1018 (1892). *Illinois Central,* which is considered to be the bellwether case, involved a situation in which the City of Chicago and the State of Illinois had granted the right to the railroad to the bed of Lake Michigan for an area a mile in length along the shore and a mile out into the lake, which encompassed substantially the entire lake bed available for the harbor of the City of Chicago. Because of the public interest, the *jus publicum,* in the use of the waters, the court held that the governmental authorities had exceeded their power in granting the use of the bed of the lake to the railroad which could, for all practical purposes, impede navigation except as desired or permitted by the railroad. At the same time it confirmed the right of the railroad to fill and destroy the shallow part of the harbor which was not fit for practical navigation and even went so far as to send the case back to the lower court for a determination whether certain areas had sufficient depth to be navigable.

There is no claim in the present case that the fill for the airport covers a part of the bed of the bay over which the waters are used for other than very casual navigation of the recreational kind.[2] It should also be pointed out that in *Illinois Central* the purported right had been given to private use and not to another public use as is the case here. Subsequently, *Shively v. Bowlby, supra,* defined the holding of *Illinois Central* as follows:

> "* * * [I]t was recognized as the settled law of this country that the ownership of and dominion and sovereignty over lands covered by tide waters, or navigable lakes, within the limits of the several States, belong to the respective States within which

---

[2] The U. S. Army Engineers has granted a permit for the fill in question.

they are found, with the consequent right to use or dispose of any portion thereof, when that can be done without *substantial impairment* of the interest of the public in such waters, and subject to the paramount right of Congress to control their navigation so far as may be necessary for the regulation of commerce. * * *." (Emphasis added.) 152 US at 47.

The dispute in *Shively* was over the ownership in tidelands, and the Supreme Court set forth the following language of the Supreme Court of Oregon in the same case, 22 Or at 427:

"* * * The whole question is for the state to determine for itself; it can say to what extent it will preseve its rights of ownership in them, or confer them on others. Our state has done that by the legislation already referred to, and our courts have declared its absolute property in and dominion over the tide lands, and its right to dispose of its title in such manner as it might deem best, unaffected by any 'legal obligation to recognize the rights of either the riparian owners, or those who had occupied such tide lands,' other than it chose to resign to them, subject only to the paramount right of navigation and the uses of commerce. * * *." 152 US at 56.

The Supreme Court then said:

"By the law of the State of Oregon, therefore, as enacted by its legislature and declared by its highest court, the title in the lands in controversy is in the defendants in error; and, upon the principles recognized and affirmed by a uniform series of recent decisions of this court, above referred to, the law of Oregon governs the case." 152 US at 57.

In a discussion of *Illinois Central* in Sax, "The Public Trust Doctrine in Natural Resource Law: Effective Judicial Intervention," 68 Mich L Rev 473, 489 (1970), we find the following:

"The Supreme Court upheld the state's claim and wrote one of the very few opinions in which an express conveyance of trust lands has been held to be beyond the power of a state legislature. It is that result which has made the decision such a favorite of litigants. But the Court did not actually prohibit the

[202]

disposition of trust lands to private parties; its holding was much more limited. What a state may not do, the Court said, is to divest itself of authority to govern the whole of an area in which it has responsibility to exercise its police power; to grant almost the entire waterfront of a major city to a private company is, in effect, to abdicate legislative authority over navigation."

The article states, after a review of the cases, that

"* * * what one finds in the cases is not a niggling preservation of every inch of public trust property against any change,nor a precise maintenance of every historical pattern of use. * * *.

"* * * * *.

"These traditional cases suggest the extremes of the legal constraints upon the states; no grant may be made to *a private party* if that grant is of such amplitude that the state will effectively have given up its authority to govern, but a grant is not illegal solely *because it diminishes in some degree the quantum of traditional public uses."* (Emphasis added.)

There is nothing in the public trust doctrine as espoused by *Illinois Central* or *Shively* which limits fills of the present kind to those for water-related uses. There is no grant here to a private party which results in such substantial impairment of the public's interest as would be beyond the power of the legislature to authorize.

■    Having decided that the public trust doctrine does not prevent all fills for other than water-related uses, we address the next issue which is the extent of the authority granted to the Director to approve permits for fills. This must be determined by an examination of legislative purpose as expressed in the fill and removal law. The legislature expressed its policy in ORS 541.610, as follows:

"(1) The protection, conservation and best use of the water resources of this state are matters of the utmost public concern. Streams, lakes and other bodies of water in this state, including not only water

and materials for domestic, agricultural and industrial use but also habitats and spawning areas for game and food fish, avenues for transportation and sites for public recreation, are vital to the economy and well-being of this state and its people. Unregulated removal of material from the beds and banks of the waters of this state may create hazards to the health, safety and welfare of the people of this state. *Unregulated filling* in the waters of this state may result in interfering with or injuring public navigation, fishery and recreational uses of the waters. *In order to provide for the best possible use of the water resources of this state, it is desirable to centralize authority* in the Director of the Division of State Lands, and *implement control of the* removal of material from the beds and banks or *filling of the waters of this state.*

"(2) *The Director* of the Division of State Lands *shall take into consideration all beneficial uses of water* including streambank protection *when administering fill* and removal statutes.

"* * * * *." (Emphasis added.)

The court finds that it has no unanimity of opinion concerning the authority granted to the Director. The majority believes that it was intended that the Director weigh the extent of the public need for the fill as compared with the public interest in the preservation of the water for navigation, fishing and public recreation and that after doing so he should grant the permit accordingly. The remainder of the court believes that it was the intention of the legislature that water resources be used only to provide a water-related public benefit and that the Director, without regard to the requirements of the public trust doctrine, was not intended to be granted the authority to issue fill permits for other than water-related uses. As can be imagined from the almost evenly divided court, the two competing interpretations of the statutes have been long and arduously debated and any analysis necessarily involves a comparison of the two constructions.

■ No one claims that the provisions of ORS 541.610 are clear, precise or other than ambiguous. Therefore, we examine the balance of the statutes within the fill and removal law as an aid in determining legislative intent. ORS 541.625(2) specifies the considerations imposed upon the Director in granting a permit. They are, in part, as follows:

"* * * * *.

"(2) The Director of the Division of State Lands may issue a permit applied for under ORS 541.620 for filling waters of this state. In determining whether or not a permit shall be issued, the director shall consider the following:

"(a) Whether the proposed fill *unreasonably interferes* with the paramount policy of this state to preserve the use of its waters for navigation, fishing and public recreation;

"(b) Whether the proposed fill *conforms to sound policies of conservation* and would not interfere with public health and safety;

"(c) Whether the proposed fill *is in conformance with existing public uses* of the waters; and

"* * * * *." (Emphasis added.)

This language demonstrates that the legislature intended to allow some interference with the preservation of navigation, fishing and public recreation. It suggests it was not intended to limit permits to water-related uses because it allows interference with such uses as long as the interference is not unreasonable. Whether or not the interference with water-related uses is unreasonable necessarily depends upon the extent of public need for the use which so interferes. The only way this can be determined is by weighing the extent of the public need for the fill against the interference with the named water-related uses. This, we believe, is how the statute was intended to be read.

There is nothing in the statement of policy in ORS 541.610 which leads us to believe that the legislature intended to prohibit the granting of permits for all fills except for water-related uses. If the legislature had so

intended, it could and surely would have said so in simple terms. It did not. Words such as "Unregulated filling," "implement control of the * * * filling," and "shall take into consideration all beneficial uses of water * * * when administering fill * * * statutes," do not indicate the legislature intended to prevent all uses except those which are water related. It intended that all doubt should be resolved in favor of the protection of the water-related uses of navigation, fishing, and recreation, but it did not intend to prohibit fills for all other uses. No one has suggested how piers for bridges or fills for bridge approaches are going to be permitted if permits are limited to water-related uses and, obviously, they cannot be.[3] Bridges for motor traffic are no more water related than are airports for airplanes.

■ It can be argued that a legislative intent as espoused by this opinion can no more be found in ORS 541.610 than an intent to permit fills for only water-related uses can be found. However, when the balance of the statutory scheme is searched as an aid in determining what was intended by the inexact and ambiguous language of that statute, language is found which indicates a weighing process was intended with any doubt always being cast on the side of preservation. The use of "unreasonably interferes" necessarily requires a weighing process. The statutory format does not make it appear that it was intended that the issuance of permits be limited to situations in which water-related uses do not interfere with water-related uses.

The Attorney General suggested to the legislature a list of enumerated criteria for the granting of permits, which list contained the following:

---

[3] It could be argued that using the water and its bed as an aid to transporting vehicular motor traffic across or over the water is a water-related use. However, this argument is too tenuous because water-related uses under the statute have to do with navigation, fishing, and water recreation.

"(a) The proposed fill *does not interfere* with the paramount policy of this state to preserve the scenic beauty of its waters and their use for navigation, fishing and public recreation;" (Emphasis added.)

The emphasized portion demonstrates that the Attorney General was advocating a statutory scheme similar to the one which the minority opinion says the legislature enacted. It also demonstrates that the legislature had no intention of adopting such a restriction because it deleted the words "does not interfere" and inserted the words "unreasonably interferes." It is also interesting to note that the law covers removal of the material from beds of water as well as fills and that in much of the statutory scheme parallel language is used in the statutes without regard to whether it has reference to removals or fills. While it would be foolish to assert that there is no difference between filling waters and removing material from their beds, if it was intended to limit filling to the enumerated water-related uses, it is remarkable that identical language is used in both instances when no one can rationally contend that removal of material must be for a water-related purpose.

■ Because we hold that the statutory scheme authorizes the issuance of a permit in this case if the Director finds that the public need for the enlargement of the airport outweighs the detriment to the use of the waters in question for navigation, fishing and recreational purposes, and because we hold that the public use doctrine does not prevent a permit in such circumstances, it is necessary to examine the record to see if the Director's findings justify the issuance of the permit. Such an examination shows that they do not. The Director set out in the right direction by finding that adequate air service at the airport in question was "important to the life and economy of the southern coastal area of Oregon."[4] The same document also contains the following:

[4] Director's finding of fact of January 21, 1977, subsequently incorporated in his findings of May 3, 1978.

"In order to help evaluate a fill project in terms of the first two criteria stated above [ORS 541.625(2)(a) and (b)], The Division of State Lands feels it is necessary to first answer the following questions:
"* * * * *.

"3. Does the project fulfill a public need? If it does, what is it?
"* * * * *.

"The Division evaluates the question of unreasonable interference as follows:

"1. If the proposed project has a public benefit, the project is evaluated on its merits, the impact on the public resources of the waterway is determined, and conditions to reduce or eliminate the adverse impacts caused by the project are placed in the permit.

"2. If the project has no public benefit of any kind, then it is unreasonable to use public resources for the project and the project would be denied.

"The airport runway extension has been found to have considerable public benefit. * * *.
"* * * * *.

"In summary, the evaluation of the airport runway extension project shows that the project benefits the general public * * *."

However, the final opinion of the Director[5] contained the following:

"*Issue 2—Economic Evidence.* Evidence was offered by Western Bank et al to show that the Coos Bay-North Bend community needs the airport. The Director in his order dated January 21, 1977, after the first contested hearing, ruled that the John Morse et al contention that there was a 'lack of legitimate need' for the runway extension was a question that should be argued in the local government forum where the issue was heard. Based on this ruling the hearings officer properly did not allow submission of economic information except as evidence to support the contention that Western Bank et al has standing as a party to this case.

---

[5] Document entitled, "FINDINGS OF FACT, OPINION, ULTIMATE FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER," dated May 3, 1978.

"The Director of the Division of State Lands in following the directives of ORS 541.605 et seq. has a responsibility to determine the legitimacy of the project and possible alternative locations for the project. However, the basic concern of the Director is the impact of the project on the natural resources of the waterway involved. The issue of the project's relative economic impacts on the local community is more properly a subject of local government and its planning functions."

This clearly demonstrates that the Director was of the opinion that he had no duty to evaluate independently the extent of the public need for the extension of the airport and that he relied upon the determination of the City of North Bend that the public needed it. The extent of the need must be evaluated by the Director before he can balance it against the detriment to navigation, fishing and recreational uses of the water in question. This he failed to do. He also failed to make any ultimate finding of fact that the public need for the airport extension outweighed the detriment to such water-related uses.

In the absence of a finding that the public need predominates, there is no basis for the issuance of the permit and the decision of the Court of Appeals setting aside the issuance of the permit by the Director of State Lands is affirmed.

**HOWELL, J.,** concurring in the result.

I agree with the majority that the decision of the Court of Appeals should be affirmed, but for entirely different reasons from those contained in the majority opinion. Accordingly, I concur only in the result reached by the majority.

I do not believe that the Legislature has authorized the Director of the Division of State Lands to issue a permit such as he issued in the present case. I do agree that the statutory language is unclear. Under these circumstances, our doubts should be resolved against

[209]

any extension of the Director's authority and in favor of preserving this state's existing water resources.

I do not mean to imply that the majority's construction of the statutes is unreasonable. We all agree that both petitioners and respondents have plausible arguments in support of their respective theories. Nevertheless, I am more persuaded by the respondents' position for the following reasons.

In enacting the Fill and Removal Law, the Oregon Legislature provided the following policy statement, codified in ORS 541.610:

> "(1) The protection, conservation and best use of the water resources of this state are matters of the utmost public concern. Streams, lakes and other bodies of water in this state, including not only water and materials for domestic, agricultural and industrial use but also habitats and spawning areas for game and food fish, avenues for transportation and sites for public recreation, are vital to the economy and well-being of this state and its people. Unregulated removal of material from the beds and banks of the waters of this state may create hazards to the health, safety and welfare of the people of this state. Unregulated filling in the waters of this state may result in interfering with or injuring public navigation, fishery and recreational uses of the waters. *In order to provide for the best possible use of the water resources of this state,* it is desirable to centralize authority in the Director of the Division of State Lands, and implement control of the removal of material from the beds and banks or filling of the waters of this state.
>
> "(2) The Director of the Division of State Lands shall take into consideration all beneficial uses of water including streambank protection when administering fill and removal statutes." (Emphasis added.)

Although this statement of policy does not explicitly limit the Director's discretion, it is of aid in determining the policy against which petitioner's action must be measured. The fact that a statute is not in

[210]

the form of a directive or compulsory standard does not mean it cannot be used in evaluating administrative action to determine whether it is consistent with the relevant legislative policy. *Anderson v. Peden,* 284 Or 313, 320, 587 P2d 59 (1978). Despite the absence in the statute of an express limitation on petitioner's power, I believe such a limitation is implicit in the statutory language.

The statute provides that authority over fills is centralized in the Director of the Division of State Lands "[i]n order to provide for the best possible use of the water resources * * *." Water resources, of course, can be used to provide both water-related and non-water-related public benefits. The benefits specified in the statute, however, assume use of the water as such:

> "* * * Streams, lakes and other bodies of water in this state, including not only water and materials for domestic, agricultural and industrial use but also habitats and spawning areas for game and food fish, avenues for transportation and sites for public recreation, are vital to the economy and well-being of this state and its people. * * *."

This language indicates a legislative policy in favor of enhancing the public's use of water resources *as water resources.* As such, it militates against use of water resources to provide a nonwater-related public benefit. This reading of the legislative policy is buttressed by the fact that the interests mentioned in the statute, "public navigation, fishery, and recreational uses of the water," are all water related. While other interpretations are possible, I agree with respondents that the thrust of the language in ORS 541.610 is toward limiting petitioner's discretion to authorization of fills that are in some way water related.

Respondents' position also is supported by an examination of the express factors the Director is to consider in deciding whether to issue a fill permit. ORS 541.625(2) provides:

> "The Director of the Division of State Lands may issue a permit applied for under ORS 541.620 for

[211]

filling waters of this state. In determining whether or not a permit shall be issued, the director shall consider the following:

"(a) Whether the proposed fill unreasonably interferes with the paramount policy of this state to preserve the use of its waters for navigation, fishing and public recreation;

"(b) Whether the proposed fill conforms to sound policies of conservation and would not interfere with public health and safety;

"(c) Whether the proposed fill is in conformance with existing public uses of the waters; and

"(d) Whether the proposed fill is consistent with a duly enacted zoning or land use plan for the area where the proposed fill is to take place."

It is apparent from an analysis of these factors that the Legislature's concern was with promoting water-related interests. ORS 541.625(2)(a) and (c) both focus on the public interest in use of the water. It is not necessary for us to determine whether the proposed Coos Bay fill is "inconsistent" with these criteria, as the Court of Appeals held.[1] It is sufficient for present purposes to note that the factors reflect a strong legislative policy in favor of preserving public use of the water.

The Director, of course, emphasizes that the statute only requires him to "consider" the enumerated factors. From this he seems to argue that he is left with unlimited discretion if, after "considering" the statutory criteria, he sees no reason not to permit the fill. This analysis reflects a misunderstanding of the role allocated to administrative agencies in the governmental scheme. To argue that the Director is free to allow anyone to use the state's land for his own purposes

---

[1] The Court of Appeals stated:

"* * * A major landfill undertaken to accommodate an upland use, *i.e.,* a nonwater-related use such as the airport runway extension project authorized by this order, is inconsistent with both of these criteria [contained in ORS 541.625(2)(a) and (c)] and, therefore, is impermissible under the statute and beyond the statutory authority of the Division." 34 Or App at 868.

[212]

unless there is a demonstrated reason *not* to allow it puts the cart before the horse. The question is for what objectives the legislature authorized the Director to *allow* such uses, not under what circumstances he can *refuse* them.

The fact that an agency "considers" certain factors does not of itself validate administrative action unless that action also furthers the relevant legislative policy. Judicial review of administrative action therefore requires that the court engage in a two-step analysis. It must first determine the relevant legislative policy. Having done so, it must then determine whether the agency has complied with statutory directives in a manner that furthers the relevant policy. While the statutory directives may be of aid in determining legislative policy, they do not by themselves define that policy.

The Director contends that the relevant legislative policy is not the prohibition of nonwater-related fills completely, but merely the prohibition of those fills that unreasonably interfere with the public's water-related interests. In support of this contention, he relies on the language of ORS 541.625(2)(a), which requires the Director to consider "[w]hether the proposed fill unreasonably interferes with the paramount policy of this state to preserve the use of its waters for navigation, fishing, and public recreation." However, the subsection actually repeats that the "paramount policy" of the state is to preserve the use of its waters for navigation, fishing, and public recreation. In light of the statement of legislative policy contained in ORS 541.610, I believe a better reasoned interpretation of ORS 541.625(2)(a) merely allows the Director to authorize fills that, while possibly interfering with one water-related interest, nevertheless enhance another water-related interest. For example, the Director could authorize a fill that benefits the public interest in navigation even though that fill interferes to some degree with public fishing or recreation interests. The Director could not, however, authorize a fill

[213]

that interferes with the public's water-related interests but provides no water-related benefit whatsoever.

I find further support for my interpretation of the statutes in the legislative history of the Fill and Removal Law. During hearings on the bill that was to give petitioner authority to permit fills, the Legislature had before it testimony from the Attorney General that its power to authorize the filling of Oregon waters might be limited:

> "We are not in any position to define precisely what all these public rights are, but I think we are in the position that we have to advise the agencies that we represent, which include the State Land Board and various other agencies of state government, that there is a good likelihood that, considering the trend of the law and considering the trend of the time, the courts are going to continue to expand this doctrine but the Oregon courts will follow noted decisions in other states which have expanded and which say that *anything that affects the recreational use of our waters in this state or any kind of fill that would affect those who use it, it is not permissible and is an inalienable right of the public* which can be enforced either through a public official or by private action. [Emphasis added.]

> "This means that in this posture, if SB 224 passes in its present form, or even with the amendments I have to date, and one of those sets of amendments says that (concern for the public interest) is one of the standards the State Land Board must follow in granting permits for fills so that it does not interfere with the rights of navigation and fishery. I think we would almost have to advise the Board that it would be questionable whether any fill doesn't interfere with that right. Secondly, if SB 224 didn't pass, we're going to be left in a very difficult situation. We'll certainly have to advise the Land Board as to lands that they control now, that they should not grant any permits for any kind of fill no matter what its purpose would be, and secondly we will probably have to institute a considerable amount of litigation to try to determine what the law is, and to get this question settled. * * *" Remarks of Attorney General Lee

Johnson, House Subcommittee on Natural Resources (May 12, 1971).

The Legislature also had before it at that time a tentative draft of what eventually became the Attorney General's "Tidelands Opinion," 35 Op Att'y Gen 844 (1971). In that draft, the Attorney General expressed a narrow view of the Legislature's power to permit the filling of tidelands. After observing that "[t]he courts have taken a very restrictive view as to what may be done by the legislature in respect to submerged lands," the opinion concluded:

> "In summary and in answer to your second question, it is our opinion that the Division of State Lands does not have the authority under the filled lands law to permit the filling of tidelands where to do so would result in the destruction of natural clam beds. * * * [B]ecause of the facts assumed in the question, namely the destruction of clam beds, it is our opinion that neither the Department of Environmental Quality nor the Division of State Lands would have the authority to issue a permit to make a fill on tidelands under the filled lands law, *unless it could be shown that such a fill was necessary to construct facilities in aid of navigation on the waters in question* and that the injury to the clam beds could not reasonably be avoided." (Exhibits on SB 224, House Subcommittee on Natural Resources May 12, 1971) (emphasis added).

Although the quoted passage refers to the Division's statutory authority, it appears from other parts of the opinion that the Attorney General's construction of the statute was based in large part on the assumption that the Legislature lacked the *power* to delegate more extensive authority to the Division.[2]

The majority notes that the Attorney General suggested certain criteria to guide the Director in

---

[2] Elsewhere the opinion states:

"* * * While the state may dispose of its tidelands, *it cannot by such disposition destroy the public's rights* in the waters over those tidelands, and the owner of the tidelands holds title subject to the public right of navigation and corollary rights included thereunder." (Emphasis added.)

authorizing fills and that the Legislature modified the suggested criteria in the direction of granting the Director broader discretion. That is true, but there is nothing in the legislative history to indicate the Legislature believed it was exceeding its power, as defined by the Attorney General, in enacting the Fill and Removal Law. Absent evidence to the contrary, I would not attribute to the Legislature an intention to do something the Attorney General told it it could not.

I would also note that while petitioner's interpretation of its statutory authority is entitled to some deference, that interpretation, insofar as expressed in petitioner's administrative rules, has thus far been inconsistent. In fact, it is somewhat ironic that in the present case petitioner, during hearings on the permit application, excluded the very evidence necessary to determine whether there was a nonwater-related need for the fill in question. This demonstrates that the Director itself recognizes that it lacks the expertise to determine whether or not a proposed fill serves a nonwater-related "public benefit," yet this is the test the majority today adopts for determining what fills are permitted under ORS 541.605 et seq.

I would hold that the Director is authorized to permit water-related fills only, and I would therefore affirm the Court of Appeals.

Lent, J., and Linde, J., join in this opinion.

**BRYSON, J.,** concurring.

I concur in the opinion of Justice Holman, including the statutory interpretation of ORS 541.610 *et seq.* which states the statutory authority of the Oregon Division of State Lands as it applies to the facts of this case. I also agree that the common law "public trust" doctrine has no application under the facts of this case and does not limit "fills" of the kind here present "to those for water-related uses."

[216]

Beginning with *Bowlby v. Shively,* 22 Or 410, 427, 30 P 154, 160 (1892), this court held

"* * * that when the state of Oregon was admitted into the union, the tide lands became its property and subject to its jurisdiction and disposal; * * * that the state has the right to dispose of them in such manner as she might deem proper, as is frequently done in various ways, and whereby sometimes large areas are reclaimed and occupied by cities, and are put to public and private uses, state control and ownership therein being supreme, subject only to the paramount right of *navigation and commerce.* The whole question is for the state to determine for itself; it can say to what extent it will preserve its rights of ownership in them or confer them on others. Our state has done that by the legislation * * *." (Emphasis added.)

No one in this case seriously contends that the "fill" will obstruct "navigation," and the construction of an adequate airport will certainly aid "commerce."

The legislature adopted ORS 541.605 to 541.695 and "centralize[d] authority in the Director of the Division of State Lands, and implement[ed] control of the removal of material from the beds and banks or filling of the waters of this state." ORS 541.610(1). The Oregon Legislature created and adopted the above statutes and certainly it can change or even repeal these laws.

On the same tone, it is worth stating that the increased flow of litigation from the public sector of law could be diminished if the legislature would state more definitely the policy, framework, and authority for the state agency or commission to perform in. Delegation of authority by the legislature to unelected state officers or employees is an easy way for the legislature to dispose of important but controversial issues. But it does not replace the better way of enacting legislation, which is to specifically set forth the policy of the state and the framework and authority of state agencies rather than leaving the courts to interpret the meaning of legislative enactments.

[217]

In a long line of cases exemplified by *Van Winkle v. Fred Meyer, Inc.,* 151 Or 455, 466, 49 P2d 1140 (1935), this court held:

"* * * It is a fundamental principle of constitutional law that in delegating powers to an administrative body the legislature must prescribe some rule of law or fix some standard or guide by which the actions of that body, in administering the law, are to be governed and made to conform. * * *."

*See also City of Portland v. Welch,* 154 Or 286, 303, 59 P2d 228 (1936); *Wasco County PUD v. Kelly,* 171 Or 691, 710, 137 P2d 295 (1943); *Demers v. Peterson,* 197 Or 466, 469, 254 P2d 213 (1953); *General Electric Company v. Wahle,* 207 Or 302, 329, 296 P2d 635 (1956).

It is realized that beginning with *So. Pacific Co. v. Con. Freightways,* 203 Or 657, 666, 281 P2d 693 (1955), this court retreated from the rule laid down in *Van Winkle v. Fred Meyer, Inc., supra,* and held:

"The mere fact that an administrative authority is granted discretion in the exercise of power conferred upon it by a law does not necessarily demonstrate that the discretion amounts to a use of legislative power. Any power other than a legislative one which the legislature may exercise it may delegate. * * *."

In *Dilger v. School District 24CJ,* 222 Or 108, 113, 352 P2d 564 (1960), the court, in a divided opinion, stated:

"* * * [W]here a statute is silent as to the manner in which a governmental agency such as a district school board is to carry out the purpose of the statute, it is permissible in determining the nature of the agency's functions to look at the character of its function as defined in other statutes. * * *."

In *Warren v. Marion County et al,* 222 Or 307, 313, 314, 353 P2d 257 (1960), the court stated:

"There is no constitutional requirement that all delegation of legislative power must be accompanied by a statement of standards circumscribing its exercise. * * *

[218]

"* * * [T]he important consideration is not whether the statute delegating the power expresses *standards,* but whether the procedure established for the exercise of the power furnishes adequate *safeguards* to those who are affected by the administrative action. * * *." (Emphasis in original.)

Thus, the court has abetted, or somewhat encouraged, the legislature to adopt "incomplete legislation" and to delegate to agencies or commissions more and more authority to adopt regulations that complete the legislation as they deem appropriate. It is this kind of incomplete legislation that encourages litigants to have the courts say what the legislature did or did not intend by the legislation adopted. Until the legislature reclaims its right and duty to declare the state policy by enacting complete and plainly worded[1] legislation, the courts will be inundated with this type of litigation. I would affirm the conclusion that the permit cannot issue, but I would remand to the Oregon Division of State Lands.

---

[1] "Every act, and joint resolution shall be plainly worded, avoiding as far as practicable the use of technical terms." Oregon Constitution, Art IV, § 21.