BALMER, J.
*62 **356 In this case, we review a final order of the Department of State Lands (DSL) that granted a permit to the Port of Coos Bay (Port) in connection with the construction of a deep water marine terminal in Coos Bay. The permit allows the Port to dredge 1.75 million cubic yards of material from the bay, while also imposing a number of conditions to address environmental concerns. Petitioners are environmental advocacy groups who argue that the Port's application did not meet the requirements for issuing a permit set out in ORS 196.825. An administrative law judge (ALJ) held a contested case hearing and rejected petitioners' arguments. DSL reviewed the conclusions of the ALJ and issued a final order affirming the permit. The Court of Appeals affirmed DSL's final order. Coos Waterkeeper v. Port of Coos Bay , 284 Or. App. 620, 395 P.3d 14 (2017). Petitioners contend that DSL erred in failing to consider evidence of certain negative effects of the construction and operation of the terminal in the permit application review process. On review, we hold that DSL properly considered the criteria set out in ORS 196.825 and did not err in granting the permit. We therefore affirm.
I. FACTS AND PROCEEDINGS BELOW
In 2007, the Port submitted an initial application to DSL proposing to construct a new multi-berth, multi-user marine terminal in Coos Bay. Over the next few years, the department requested more information on various aspects of the project, and the Port responded with additional plans and studies refining and supporting its chosen site and design, the public need for the terminal, the placement of removed material, the effects on aquatic life, and other aspects of the development.
Ultimately, the finalized plan called for construction to occur in two phases. The "freshwater phase" would involve excavating a slip and constructing facilities to accommodate vessels and cargo. That excavation would occur in an upland area, separated from the bay by an existing earthen berm. After the slip's completion, the berm would be removed and the slip would become part of the bay. Because the excavation and construction of the freshwater phase would not **357 occur in wetlands or waters of the state, the Port did not seek, and DSL did not issue, a removal fill permit for that work. The "saltwater phase," in contrast, would consist of removing the berm, dredging an access channel from the slip to the existing navigation channel in the bay, and per-forming a small amount of in-water construction necessary to complete the cargo wharf. Dredging the access channel would submerge approximately 13 acres of intertidal area and remove 1.75 million cubic yards of material. For those activities, the Port sought a removal fill permit.
The department considered the permit application under Oregon's removal fill law, ORS 196.800 - 196.990, and the department's rules implementing that statute, OAR chapter 141, division 85. In findings that accompanied the permit, the department noted that its authority is limited to the removal from and fill of waters of the state and that it "has no authority to determine whether a particular project (other than the portion that involves removal/fill within waters of the state) is good for the State of Oregon." The permit explained that the Port had considered eight alternative sites and designs for the project, and that the preferred alternative had the least impact on water resources. The permit also required the Port to mitigate the effects on wetlands through the creation, restoration, and enhancement of over 40 acres of wetlands, under Oregon's Removal-Fill Mitigation Fund Act.
The findings accompanying the permit also discussed the use of the terminal, explaining that the Port had a preliminary commitment from the Jordan Cove Energy Project to use one of the two cargo berths for importing or exporting liquefied natural gas (LNG) and also had received expressions of interest from other potential users of the facility. It noted that, in issuing the permit, "the Department is not making a finding regarding need for or public benefit from a terminal *63 facility that would import or export LNG." It also observed, however, that the legislature has designated the development of deepwater port facilities at Coos Bay as a "state economic goal of high priority." ORS 777.065.
Petitioners appealed the permit, and in 2012 an administrative law judge held a hearing. The parties filed **358 cross-motions for summary determination, and the ALJ issued a proposed order upholding the permit. Petitioners then appealed that proposed order to the department. The department issued a final order that adopted in full the findings of fact and conclusions of law of the proposed order.
Petitioners appealed to the Court of Appeals and made two arguments. First, petitioners asserted that the "freshwater phase" required a removal fill permit, and the department's decision otherwise was error. The Court of Appeals rejected that argument, holding that DSL "lacked authority to regulate the freshwater phase of the project." Coos Waterkeeper , 284 Or. App. at 640, 395 P.3d 14. Petitioners do not renew that argument here. Second, they asserted that the department should have considered the effects of the operation of the terminal when deciding whether to issue the permit. The court also rejected that argument, explaining that the statute does not require DSL to consider the "effects of post-construction operation of the development." Id. at 636, 395 P.3d 14. Petitioners sought review, and we allowed the petition.
In this court, petitioners argue that DSL erred in its interpretation of the removal fill statute and improperly limited which effects of the terminal it considered when it granted the permit. Petitioners contend that those errors arise from DSL's incorrect interpretation of the statutory term "project" in ORS 196.825(1). Petitioners urge an understanding of "project" that encompasses the effects of the operation of the terminal, whereas the Port and DSL (respondents) argue that the legislature intended the word to be more limited in scope. Before examining those positions further, we turn to the statute at issue.
II. STATUTORY FRAMEWORK
DSL has authority to issue permits to persons seeking "to remove material from the beds or banks or fill any waters of this state." ORS 196.815.[1] ORS 196.825 sets out the procedures for applying for a permit and the department's **359 processing of applications. Subsection (1) of that statute contains a general standard, using the disputed word "project," that must be satisfied for DSL to issue a permit:
"(1) The Director of the Department of State Lands shall issue a permit applied for under ORS 196.815 if the director determines that the project described in the application:
"(a) Is consistent with the protection, conservation and best use of the water resources of this state as specified in ORS 196.600 to 196.905 ; and
"(b) Would not unreasonably interfere with the paramount policy of this state to preserve the use of its waters for navigation, fishing and public recreation."
(Emphasis added.) Subsection (2) then lists nine criteria that DSL must consider in determining whether to issue a permit. All of those criteria refer to "fill or removal" and only one refers to the "project":
"(2) In determining whether to issue a permit, the director shall consider all of the following:
"(a) The public need for the proposed fill or removal and the social, economic or other public benefit likely to result from the proposed fill or removal. When the applicant for a permit is a public body, the director may accept and rely upon the public body's findings as to local public need and local public benefit.
"(b) The economic cost to the public if the proposed fill or removal is not accomplished.
*64 "(c) The availability of alternatives to the project for which the fill or removal is proposed.
"(d) The availability of alternative sites for the proposed fill or removal.
"(e) Whether the proposed fill or removal conforms to sound policies of conservation and would not interfere with public health and safety.
"(f) Whether the proposed fill or removal is in conformance with existing public uses of the waters and with uses designated for adjacent land in an acknowledged comprehensive plan and land use regulations.
**360 "(g) Whether the proposed fill or removal is compatible with the acknowledged comprehensive plan and land use regulations for the area where the proposed fill or removal is to take place or can be conditioned on a future local approval to meet this criterion.
"(h) Whether the proposed fill or removal is for stream-bank protection.
"(i) Whether the applicant has provided all practicable mitigation to reduce the adverse effects of the proposed fill or removal in the manner set forth in ORS 196.800. In determining whether the applicant has provided all practicable mitigation, the director shall consider the findings regarding wetlands set forth in ORS 196.668 and whether the proposed mitigation advances the policy objectives for the protection of wetlands set forth in ORS 196.672."
(Emphasis added.) The remainder of ORS 196.825 details additional criteria and procedures that we examine later.
We consider petitioners' claims under the Administrative Procedures Act, which governs our review of an agency's final order in a contested case. ORS 183.480(2). Petitioners raise no factual disputes and challenge only DSL's legal interpretation and application of ORS 196.825. We review that challenge to determine whether the agency has "erroneously interpreted a provision of law." ORS 183.482(8)(a). If a correct interpretation "compels a particular action," then we must set aside or modify the order, or remand the case to the agency. Id.
Our standard of review of an agency's interpretation of a statute depends on whether the statutory term at issue is an exact term, an inexact term, or a delegative term. Bergerson v. Salem-Keizer School District , 341 Or. 401, 411, 144 P.3d 918 (2006). Here, the disputed words are inexact terms, meaning that the legislature used the words to express "a complete legislative meaning but with less precision" than if it had used an exact term. Id. On review, we interpret the meaning of inexact terms anew, without deference to the agency's interpretation, under the framework set out in State v. Gaines , 346 Or. 160, 171-72, 206 P.3d 1042 (2009). OR-OSHA v. CBI Services, Inc. , 356 Or. 577, 585, 341 P.3d 701 (2014). Thus, we review the department's **361 interpretation of the inexact statutory term "project" for errors of law by interpreting it ourselves pursuant to Gaines .
III. DISCUSSION
With that framework in mind, we turn to the parties' arguments. Petitioners assert that DSL erred in processing the permit application because it did not consider the effects of the completed terminal's presence or of the completed terminal's operation, including, for example, ship traffic and the possibility of cargo spills.[2] We call that *65 set of effects the "operational effects." Petitioners provide three reasons in support of that position. First, petitioners assert that the word "project" in ORS 196.825(1) encompasses the operation of the terminal, and thus defines the required scope of DSL's analysis to include the operational effects. Second, petitioners argue that DSL's analysis was unlawfully "lopsided" because DSL considered some positive operational effects, such as employment, but not negative operational effects. Finally, they contend that not considering operational effects fails to give effect to some parts of the statute, in violation of the rules of statutory construction. We address each of those contentions below.
Petitioners contend that "project" in ORS 196.825(1) means the "construction, existence, and operation of the project for its intended use" and that DSL should have considered **362 negative operational effects in evaluating the permit application.[3] They rely in part on the agency's own definition of "project" as "the primary development or use intended to be accomplished for which the fill or removal is proposed," for example, a "retail shopping complex, residential development, stream bank stabilization or fish habitat enhancement." Former OAR 141-085-0510(69) (2011) (effective Jan. 1, 2010). They also argue that because "[n]o one disputes that the 'project' in this case is the marine terminal"-and indeed, the Port's application described the excavation of the channel and the construction of the marine terminal as the "project"-the statutory word should be given that meaning.
In contrast, DSL and the Port contend that "project" in ORS 196.825(1) is not a general reference to the construction and operation of the terminal. Rather, they assert that "project" in ORS 196.825(1)"relates to the removal and fill activity and construction of the proposed development." Therefore, the word "project" in ORS 196.825(1) does not require an analysis of operational effects; rather, the determinations required in ORS 196.825(1) are limited in scope to the aggregate of the nine considerations required under ORS 196.825(2), eight of which concern only the "fill or removal." See ORS 196.825(2)(a), (b), (d)-(i). Analysis of the effects of construction is required under ORS 196.825(2)(c), which expressly refers to the "alternatives" to the "project." In its final order, DSL explained that interpretation: "The general determination clause [referring to "project"] in ORS 196.825(1), * * * must include the broader of the two terms [i.e. , "project" or "fill or removal"] for consistency in drafting and interpretation. * * * The use of 'project' in ORS 196.825(1), however, does not expand the department's analysis for the other eight criteria in ORS 196.825(2)." For respondents, **363 "project" includes fill, removal, and construction; it does not include the operation of the completed terminal.
We interpret the statute and the word "project" by looking to the text, context, and legislative history. We note at the outset that the legislature did not define the term in the statute. Petitioners are correct that we often assume that the legislature intended words that are not defined in statute (and that are not technical terms) to have their "plain, natural, and ordinary meanings," which we often determine by consulting dictionary definitions. Comcast Corp. v. Dept. of Rev., 356 Or. 282, 295-96, 337 P.3d 768 (2014) (describing methodology). But here, looking to the ordinary meaning of "project" does not assist us in deciding which definition of the dictionary's ten subsenses of *66 meaning, grouped into six senses, the legislature may have intended, and petitioners offer no assistance in identifying which of the widely varying definitions the legislature may have intended. See Webster's Third New Int'l Dictionary 1813 (unabridged ed. 2002) (defining "project").[4] And even assuming that some definitions of "project" might be expansive enough to encompass the operational effects of the marine terminal, other equally or more plausible definitions are not. See State v. Cloutier , 351 Or. 68, 96, 261 P.3d 1234 (2011) ("Dictionaries, after all, do not tell us what words mean, only what words can mean, depending on their context and the particular manner in which they are used." (Emphasis in original.) ). To determine what the legislature intended the term to mean, we must consider other parts of the statute and the legislative history.
Looking to the rest of the statute, the legislature, as noted, identified nine "considerations" for DSL to use in making the permitting decision. ORS 196.825(2) provides that, "[i]n determining whether to issue a permit, the director [of DSL] shall consider all of the following:" and then sets out the considerations quoted above. All nine refer to the "fill or removal" of material, suggesting that the effects **364 of the fill or removal-rather than some other aspect of the project, such as the effects of the operation of the project after completion-were the focus of the legislature's concern in connection with the issuance of permits. Only one paragraph uses the word "project," and it simply directs the department to identify "alternatives to the project," presumably by applying the substantive criteria set out in ORS 196.825(1). ORS 196.825(2)(c). As noted, respondents agree that that provision requires analysis of the effects of the construction. And, for their part, petitioners do not argue that the phrase "alternatives to the project" somehow incorporates operational effects, and we do not see how they could.
The word "project" appears in other subsections of ORS 196.825 as well. We presume that the legislature intends the same word to have a consistent meaning throughout a statute. Id. at 99, 261 P.3d 1234. Subsection (3) states that DSL may, under certain conditions, issue a permit for a "project that results in a substantial fill in an estuary."[5] That use of the word "project" is consistent with an understanding of "project" as a term encompassing both fill or removal and construction. It makes sense to refer to a project's construction that "results" in fill. It is not, however, normal usage to talk about a completed development's operations as "result[ing]" in fill because the "fill" presumably occurred as part of the construction, and there is no indication that the legislature intended that usage. Subsection (11) also uses the word "project" in a way that suggests that the legislature intended "project" to include fill or removal and construction, but not operations.[6] That subsection states that the application must include a map *67 "showing the project site with **365 sufficient accuracy to easily locate the removal or fill site." ORS 196.825(11)(b)(A). That provision suggests that "project" means more than just the removal or fill and appears to include construction of the facility. At the same time, it also states that the application include documentation of the project's potential impact on certain resources "if the project is completed," suggesting that the "project" ends after a time and does not include an indefinite period of operations. ORS 196.825(11)(b)(E). Petitioners do not explain how a "project" that can be "completed" could also include ongoing operations. Interpreting "project" to mean the fill or removal and construction of the marine terminal, while not including the operations of the terminal, is a meaning that is consistent with the several uses of the word in the statute.
That textual analysis comports with the legislative history of the statute, which provides compelling evidence that the legislature intended "project" to have a meaning that did not include operations. The legislature added the word "project" to ORS 196.825(1) (2005) in 2007 when it passed House Bill (HB) 2105 (2007). Or. Laws 2007, ch. 849, §§ 4, 5. That bill contained several substantive changes to parts of the removal fill law not at issue here, and a number of minor "form and style" changes to ORS 196.825 that were recommended by Legislative Counsel. The bill replaced the word "removal" in ORS 196.825(1) with the word "project." That amendment, with additions italicized and deletions in brackets, provided:
"(1) The Director of the Department of State Lands shall issue a permit [to remove material from the beds or banks of any waters of this state] applied for under ORS 196.815 if the director determines that the [removal] project described in the application [will not be inconsistent:]."
Or. Laws 2007, ch. 849, §§ 4, 5.
**366 The bill also amended the nine criteria in subsection (2) that DSL "shall consider." ORS 196.825(2). Where previously those criteria referred to only the "fill"-as in "[t]he economic cost to the public if the proposed fill is not accomplished," ORS 196.825(3)(b) (2005)-the bill replaced "fill" with "fill or removal." Or. Laws 2007, ch. 849, §§ 4, 5. Committee hearings on HB 2105 included two relevant discussions of that change.
The first instance occurred in the House Energy and Environment Committee, when DSL director Louise Solliday explained that changes in the bill were "form and *** style" changes recommended by the Office of Legislative Counsel. Audio Recording, House Committee on Energy and Environment, HB 2105, Feb. 5, 2007, at 54:56, https://sos.oregon.gov/archives/Pages/records/legislative-minutes-2007.aspx (accessed July 19, 2018). That statement prompted Representative Chuck Burley to observe that "to me [it] does seem like *** a substantial change in the review criteria." Id. at 56:01. Director Solliday rejected that notion: "[T]hese are the criteria by which we review removal and fill permits within the program and have for years." Id. at 56:12.
The second discussion occurred later, at a hearing of the Ways and Means Subcommittee on Natural Resources, when legislators considered an amendment to the bill that would retain the reference to "fill" in the listed criteria, and, notably, retain the original text in ORS 196.825(1) referring to the "removal" rather than the "project." See HB 2105 (2007), -A4 amendments (June 7, 2007). Arguing against the amendment, Director Solliday again characterized the changes as "form and style changes * * * recommended by Legislative Counsel" that "[do] not change substantively how we administer [the fill and removal] program." Audio Recording, Joint Committee on Ways and Means, Natural Resources Subcommittee, HB 2105, June 7, 2007, at 10:31, https://sos.oregon.gov/archives/Pages/records/legislative-minutes-2007.aspx (accessed July 19, 2018).
The subcommittee then discussed whether to adopt the amendment. Representative Jackie Dingfelder explained that the Energy and Environment Committee had not adopted the amendment because "the understanding **367 was that Legislative Counsel recommended this so we could be consistent with current practices and other statutes." Id. at 14:42. After that statement, the committee voted to reject the amendment, and then voted to pass the bill to the full committee *68 with a "do pass" recommendation. Id. at 17:35 (statement of Rep Richard Devlin). That bill was later passed by both houses and signed into law. Or. Laws 2007, ch. 849.
Those excerpts of discussions at the Energy and Environment Committee and the Natural Resources Subcommittee highlight Director Solliday's clear and categorical message: HB 2105's changes to ORS 196.825 would be form and style changes only, were recommended by Legislative Counsel, and would not change how the department processed permits. Representative Dingfelder's comment quoted above demonstrated the legislators' reliance on that message when they passed HB 2105. Cf. Bobo v. Kulongoski , 338 Or. 111, 118-19, 107 P.3d 18 (2005) (relying on clear statements of committee members to infer legislative intent).
In summary: Prior to HB 2105, ORS 196.825 (2005) instructed the department to issue a permit if the "removal" was consistent with protection, conservation, and best use of the water resources of this state. HB 2105 changed "removal" to "project," and although that precise word change was not discussed, the legislative history reveals that legislators who discussed the bill intended for the changes to ORS 196.825 (2005) to be "form and style" changes to create consistency with current practices. The legislative history does not explain what "current practices" motivated Legislative Counsel to change "removal" to "project." But it is most likely that Legislative Counsel was motivated by the same interpretation that DSL advances here: The determinations directive to DSL in ORS 196.825(1) had to include a word broad enough to encompass all nine of the considerations in ORS 196.825(2) that DSL was supposed to evaluate to determine whether the permit should be issued-both the eight considerations addressing "fill or removal" and the consideration addressing both "fill or removal" and the "project." The obvious word to use in subsection (1)-a word that would **368 encompass all the required considerations-was "project." That understanding of the change from "removal" to "project" is consistent with our construction of the statutory text. The scope of the word "project" in that provision matches the scope of the analysis required by the nine criteria in ORS 196.825(2) ; that is, it refers to the construction, including the removal or fill, of the proposed development being considered by DSL. We therefore conclude that respondents' construction of ORS 196.825 is correct.
Petitioners nevertheless argue that DSL's own rules adopt a different, and broader, definition of "project" as "the primary development or use intended to be accomplished for which the fill or removal is proposed (e.g., retail shopping complex, residential development, stream bank stabilization or fish habitat enhancement)." Former OAR 141-085-0510(69) (2011). They assert that, in light of that definition, ORS 196.825(1) requires DSL to consider the operational effects of the marine terminal before granting a permit. As an initial matter, we disagree that the definition requires the consideration of such effects. The rule refers to the "primary development or use to be accomplished" that results from the fill or removal. We understand the word "use" in the rule to mean "purpose," as in the "purpose to be accomplished by this fill and removal" is a "retail shopping complex" or a "stream bank stabilization." See Webster's at 2523 (defining "use" as "a particular service or end: PURPOSE, OBJECT, FUNCTION"). Although "use" can also mean "continued or repeated exercise or employment," id. , the rule describes the "use" as being "accomplished." To us, that drafting suggests that "use" does not refer to an indefinite period of operations, but rather to the completion of the purpose for which the fill or removal was performed. In short, nothing in the rule suggests that "use" encompasses the ongoing operational effects of a particular project.
In any event, we have already discussed the applicable standard of review and stated that an agency's definition of an inexact term receives no deference when a court interprets the statute, because the legislature intended a complete meaning. Nevertheless, our conclusion as to the meaning of "project" is consistent with the agency's definition of that word.
**369 Next, petitioners contend that DSL's analysis was fatally "arbitrary and lopsided"
*69 because it considered some positive operational effects, such as employment, but did not consider all negative operational effects. DSL responds that the statute contemplates an analysis "skewed" towards consideration of economic benefits. Accordingly, the final order noted that the terminal-including its construction and operation as an LNG, container, or bulk goods terminal-would create hundreds of jobs and generate millions of dollars of economic activity, while at the same time it expressly declined to consider other, negative operational effects.
Petitioners argue that such an inherently unbalanced analysis is inconsistent with the statute and this court's decision in Morse v. Oregon Division of State Lands , 285 Or. 197, 590 P.2d 709 (1979), which they interpret as requiring scrutiny of "the need for, and impacts of, the underlying project as a whole." Second, they assert that for the statute to require an "arbitrary" analysis is "absurd," in violation of the canon of construction to avoid "absurd" results inconsistent with the apparent policy of the legislature. See State v. Vasquez-Rubio , 323 Or. 275, 283, 917 P.2d 494 (1996) (stating that canon). Because our above discussion of the meaning of "project" does not reveal whether DSL's "skewed" analysis violated ORS 196.825, we return to the text.
As respondents note, the text of ORS 196.825(2) expressly identifies factors that must be considered, including some future effects: The "social, economic or other public benefits likely to result from the proposed fill or removal" and the "economic cost to the public if the proposed fill or removal is not accomplished." ORS 196.825(2)(a), (b) (emphasis added). Respondents observe that there are no equivalent provisions directing consideration of future harms if the proposed fill or removal is accomplished. Moreover, as discussed above, the statute generally requires consideration of only the effects of the fill or removal and construction, and not the operational effects.
ORS 196.825(1) then directs the department to analyze those factors to determine the "best use" of the water. ORS 196.825(1)(a). The "best use" of the water is a policy **370 preference. The statute identifies guiding policies, referring to the "paramount policy of this state to preserve the use of its waters for navigation, fishing and public recreation" and other expressions of policy in ORS 196.600 to 196.905. ORS 196.825(1). In that way, the statute identifies certain types of facts as necessary to the analysis, and provides a policy framework to determine whether a given fact militates for or against the proposed project. DSL's analysis is consistent with that construction, and petitioners propose no different interpretation of the text. Rather, petitioners assert that DSL's analysis was inconsistent with this court's interpretation of the removal fill statute in Morse .
Morse , decided in 1979, is our only prior case interpreting the removal fill statute and, coincidentally, involved a fill permit for the construction of an airport on Coos Bay, less than a mile from the marine site at issue in this case. In Morse , the court concluded that the director had the statutory authority to issue the permit, but that the director had failed to make findings of public need necessary for an adequate analysis. 285 Or. at 203, 590 P.2d 709. The court interpreted that statute as requiring DSL to "weigh[ ] the extent of the public need for the fill against the interference with the named water-related uses." Id. at 205, 590 P.2d 709.
Petitioners claim that Morse teaches that the department may issue a permit only if it "balances the benefits of the proposed use against its potential harm to the state's aquatic resources, and concludes that the benefits outweigh the harm." As discussed above, however, that statement does no more than outline the analysis; it does not say which benefits should be balanced against which harms, or how they should be compared. Moreover, as we discuss below, ORS 196.825 (1979) was significantly amended after Morse in ways that undercut petitioners' argument. Even absent those changes, however, the very different facts of Morse mean that it provides little support to petitioners. In Morse , the purpose of the fill permit was to extend an airport runway into the bay, thus necessarily reducing the extent of state waters and interfering with navigation, fishing, and recreational uses in order to further *70 an entirely nonwater related use. Here, in contrast, the permit allows changes in the depth, contours, and other aspects of Coos **371 Bay in furtherance of navigation-one of the three uses that is specifically intended to be "preserved" under the statute. Indeed, the permit here will increase the extent of state waters. That does not mean, of course, that the permit must be granted without making the determinations required by statute or that appropriate conditions need not be imposed on any permit. But the factual gaps between the project at issue here and the airport extension in Morse make that decision of little moment in this proceeding.
Furthermore, the legislature has significantly amended the statute since Morse . For example, in the next legislative session, the representative for the Coos Bay area introduced HB 2985 (1981) with the purpose of increasing the emphasis given to economic factors in the permitting process. See Exhibit A, Senate Committee on Trade & Economic Development, HB 2985, July 13, 1981 (letter from Rep Bill Grannell) ("I am asking that economic benefits of a project and costs of non-approval be clearly reviewed in a balanced fashion in the decision making process."). Ultimately, that bill added three factors to the list of criteria, including "the economic cost to the public if the proposed fill [or removal] is not accomplished." Or. Laws 1981, ch. 796, § 1 (codified at ORS 196.825(2)(b) ).
The addition of that provision is just one of the changes made to the statute after this court interpreted it in Morse . The 1981 amendment and others substantially changed the text of the statute that addresses whether and how economic effects figure into the analysis. For those reasons, petitioners cannot rely on Morse to understand the legislative intent underlying the 2010 statute. Petitioners identify no part of the text or context of ORS 196.825(1) or (2) that would require DSL to consider negative operational effects, and neither can we. Respondents, however, have the plain words of ORS 196.825(2)(a) to support their position, requiring the consideration of "economic or other public benefits likely to result." We think those words clearly reflect the legislative intent.
Petitioners also argue that DSL's "lopsided" interpretation is unlawful because it is "absurd." But without ambiguity as to the legislative intent after consulting the **372 text, context, and legislative history, we do not reach canons of construction. Gaines , 346 Or. at 172, 206 P.3d 1042. We have found no ambiguity and reject petitioners' argument that DSL's interpretation of the statute is "absurd." For those reasons, petitioners have not established that DSL erred in not considering evidence outside the scope of the criteria in ORS 196.825(2).
Finally, we turn to petitioners' argument that DSL must consider evidence beyond the list of factors in ORS 196.825(2), if the evidence is relevant to the required policy determinations in ORS 196.825(1). Otherwise, they contend, subsection (1) will "ha[ve] no meaning and serve[ ] no purpose," in violation of the legislature's directive to "give effect to all" provisions when construing statutes. ORS 174.010. Petitioners assert that the text of ORS 196.825 supports their interpretation, because, in their view, the criteria listed in subsection (2) are generally not relevant to the policies identified in subsection (1). For example, petitioners assert that DSL could not determine, one way or the other, whether a "project" would "unreasonably interfere" with the state's "paramount policy" to preserve the use of its waters for navigation, fishing, and public recreation, ORS 196.825(1)(a), if it limited its analysis to the criteria listed in subsection (2), because none of the nine criteria explicitly address those uses. In addition, they observe that no part of the statute provides or implies that the express criteria "represent[ ] the only factors that DSL can consider." (Emphasis in original.)
We agree with petitioners that the two subsections are not coextensive, but disagree that that means that DSL erred in its analysis. As discussed above, subsection (1) articulates the policies that underlie the analysis of the more specific subsection (2) factors, which are the primary basis for the decision to grant or deny the permit application. Policies are, by their nature, general, so the fact that the policies set out in subsection (1) may have a broader scope than the specific factors *71 in subsection (2) is not unexpected or concerning. But the fact that the policies in subsection (1) may be broad enough, in the abstract, to reach operational effects, does not mean that the statute directs DSL to consider operational effects. We have already rejected the argument that the term "project" in **373 subsection (1) requires DSL to consider operational effects. Just as the legislature did not require consideration of operational effects through its use of the word "project," we conclude, for similar reasons, that it did not require consideration of operational effects through the inclusion of the policy objectives in subsection (1).
Moreover, DSL actually did analyze the effect of the project on the water uses identified in subsection (1). DSL's final order recognized that existing uses of Coos Bay include recreational boating, fishing, and clamming, and that dredging and other aspects of the project would interfere to some extent with those uses. DSL weighed that interference against the likely benefits of the project and concluded that the "level of interference is not unreasonable" because, in part, "the project has been designed to minimize impacts on waters of the State, including fishing and public recreation." That reasonable weighing of the anticipated benefits and detriments of a proposed project is exactly the sort of analysis that ORS 196.825(1) contemplates.
In short, petitioners fail to show that the removal fill statute requires consideration of operational effects. DSL processed the Port's application in accordance with ORS 196.825 and properly granted the permit.
The decision of the Court of Appeals and the order of the Department of State Lands are affirmed.

DSL must process an application in accordance with the laws in effect on the date it received the completed application. ORS 196.825(10). Unless otherwise noted, this opinion cites the statutes and rules in effect on December 10, 2010, the date that DSL received a complete application.

Petitioners also contend that DSL did not consider the effects of the construction of the terminal, separate from and in addition to the removal and fill itself. Petitioners made that claim before the ALJ and the department, but the Court of Appeals concluded that petitioners abandoned it on judicial review. Coos Waterkeeper , 284 Or. App. at 630 n. 9, 395 P.3d 14. Before this court, petitioners reassert that argument, claiming that they did not intend to abandon it at the Court of Appeals. DSL asserts, however, that it did consider the effects of construction through its analysis of "alternatives" for the "project" as required by ORS 196.825(2)(c). Accordingly, the Final Order includes an analysis of alternatives for the project, including effects relating to construction for each of the alternatives considered. Additionally, we note that the only construction separate from the dredging that is part of the "saltwater phase"-the phase of the development subject to DSL jurisdiction-is the installation of eight concrete pilings. As the Final Order noted, the "vast majority" of the construction related to the terminal will take place in the "freshwater phase," which is not subject to DSL's jurisdiction.
For those reasons, we reject petitioners' claim that DSL failed to consider the effects of the construction and focus on petitioners' central argument that the department erred in omitting analysis of the operational effects of the marine terminal.

For convenience, we again set out ORS 196.825(1) :
"(1) The Director of the Department of State Lands shall issue a permit applied for under ORS 196.815 if the director determines that the project described in the application:
"(a) Is consistent with the protection, conservation and best use of the water resources of this state as specified in ORS 196.600 to 196.905 ; and
"(b) Would not unreasonably interfere with the paramount policy of this state to preserve the use of its waters for navigation, fishing and public recreation."
(Emphasis added.)

The senses of "project" span from "a scheme for which there seems hope of success" to "a vast enterprise usually sponsored and financed by a government." Webster's at 1813. Moreover, petitioners do not explain how any of the definitions answer the question of whether the word "project," when used to describe a marine terminal (or any other large facility), includes the operations of that terminal (or facility) after construction is complete.

ORS 196.825(3) provides:
"The director may issue a permit for a project that results in a substantial fill in an estuary for a nonwater dependent use only if the project is for a public use and would satisfy a public need that outweighs harm to navigation, fishery and recreation and if the proposed fill meets all other criteria contained in ORS 196.600 to 196.905."

ORS 196.825(11) provides, in part:
"As used in this section:
"* * * * *
"(b) 'Completed application' means a signed permit application form that contains all necessary information for the director to determine whether to issue a permit, including:
"(A) A map showing the project site with sufficient accuracy to easily locate the removal or fill site;
"(B) A project plan showing the project site and proposed alterations;
"* * * * *
"(E) If the project may cause substantial adverse effects on aquatic life or aquatic habitat within this state, documentation of existing conditions and resources and identification of the potential impact if the project is completed."