Argued and submitted October 13, 1986, affirmed on review and on cross-review January 28, reconsideration denied March 13, petition for review denied May 27, 1987 (303 Or 454)

In the Matter of the Application
to Establish an Ambulatory Surgical Center.

## OREGON EYE ASSOCIATES,
*Petitioner - Cross-Respondent,*

*v.*

## STATE HEALTH PLANNING AND DEVELOPMENT AGENCY OF OREGON,
*Respondent - Cross-Respondent,*

## SISTERS OF ST. JOSEPH OF PEACE HEALTH AND HOSPITAL SERVICES,
a Washington non-profit
corporation authorized to do business as Sacred
Heart General Hospital, Eugene,
*Respondent - Cross-Petitioner.*

(485; CA A37851)

732 P2d 41

Peter F. Stoloff, Portland, argued the cause for petitioner - cross-respondent. With him on the briefs were Jacob Tanzer and Ball, Janik & Novack, Portland.

Eric A. Lindenauer, Portland, argued the cause for respondent - cross-petitioner. With him on the brief was Garvey, Schubert, Adams & Barer, Portland.

John A. Reuling, Jr., Assistant Attorney General, Salem, argued the cause for respondent - cross-respondent. With him on the brief were Dave Frohnmayer, Attorney General, and James E. Mountain, Jr., Solicitor General, Salem.

Before Warden, Presiding Judge, and Van Hoomissen and Young, Judges.

WARDEN, P. J.

## WARDEN, P. J.

Oregon Eye Associates (OEA) seeks review of a final order of the State Health Planning and Development Agency (SHPDA) which denied OEA's application for a certificate of need to build an ambulatory surgical center (ASC) in Eugene for the performance of outpatient eye surgery. Sacred Heart General Hospital (SHGH) intervened before the agency to oppose the application and is a respondent on review. We affirm SHPDA.

OEA is a partnership of ophthalmologic surgeons who presently perform eye surgery at SHGH, the great majority on an outpatient basis at the hospital's short stay unit (SSU). OEA proposes to build an ASC at which its partners, and possibly other surgeons, would perform their outpatient surgery. Under ORS 442.320(1), OEA is required to have a certificate from SHPDA in order to construct the facility. SHPDA denied OEA's application, and OEA then requested a reconsideration hearing. ORS 442.340(5)(b). The hearings officer recommended approval, but SHPDA's final order on reconsideration affirmed the original denial.[1] OEA then sought judicial review.

OEA does not challenge most of the facts which SHPDA specifically found or the factual conclusions that it drew. Rather, it challenges the relevance of those facts and conclusions to the issues SHPDA had to decide.[2] OEA's primary argument is that SHPDA erred by evaluating the proposed ASC according to traditional criteria,[3] such as avoiding excessive capacity or planning to allocate health care resources in order to minimize total cost to the community.

---

[1] See SHPDA v. Salem Hospital, 83 Or App 80, 82 n 1, 730 P2d 589 (1986), for a description of the procedures available for administrative review of a SHPDA decision.

[2] SHPDA argues that OEA failed to comply with ORAP 7.19(2) and that we should therefore refuse to consider its assignments of error. We do not agree that OEA violated the rule. However, its primary assignment of error is a broad attack on SHPDA's legal conclusions. Under it we can only review those broad questions. The assignment does not sufficiently challenge specific portions of SHPDA's order.

[3] For a general discussion of the National Health Planning process, see National Gerimedical Hospital v. Blue Cross, 452 US 378, 383-388, 101 S Ct 2415, 69 L Ed 2d 89 (1981).

*See* ORS 442.025(2); ORS 442.340(2)(c), (d).[4] It argues that recent state and federal legislation has made the promotion of competition the overriding—and, possibly, the only—basis for determining whether to grant a certificate to an ASC. The reason, OEA states, is that ASCs provide an inexpensive alternative to hospitals and that they are necessary to achieve the statutory goal of reducing health care costs to patients. According to OEA, SHPDA should approve an ASC if it will produce lower costs to the patient than do existing facilities. Because competition cannot exist without some excess capacity, OEA argues, previous policies designed to limit capacity are no longer relevant.

OEA's position both misstates the role Congress and the Oregon legislature intend competition to play in the certificate process and fails to understand the kinds of competition which they had in mind. The legislature has declared that the overall purpose of the process is to achieve reasonable access to quality health care at a reasonable cost. ORS 442.025(1). The problems which the legislature identified and which the process must overcome include:

"(a) The inability of many citizens to pay for necessary health care, being covered neither by private insurance nor by publicly funded program such as Medicare and Medicaid;

"(b) Rising costs of medical care which exceed substantially the general rate of inflation;

"(c) Insufficient price competition in the delivery of health care services that would provide a greater cost consciousness among providers, payors and consumers;

"(d) Inadequate incentives for the use of less costly and more appropriate alternative levels of health care;

"(e) Insufficient or inappropriate use of existing capacity, duplicated services and failure to use less costly alternatives in meeting significant health needs; and

---

[4] In discussing the relevant statutes, OEA distinguishes among statements of general policy, statements of the problem, statements of specific policies to address the problem and statements of (supposedly) policy-neutral criteria. *See Morris v. Oregon Division of State Lands*, 285 Or 197, 213, 590 P2d 709 (1979) (Howell, J., specially concurring). Although those distinctions may be of some assistance in determining the legislature's intent, they are only aids to that end. In particular, the statements of criteria appear to us, in light of the entire statute, to be designed to explain and implement legislative policy rather than being policy-neutral. Our role is to pursue the legislative intent, and we must read the statute as a whole to do so. ORS 174.010; ORS 174.020.

"(f) Insufficient primary and emergency medical care services in some rural areas of the state." ORS 442.025(2).

Both insufficient price competition *and* duplicated services are included in the list.

The statute goes on to list several ways to attack these problems:

"(4) To foster the cooperation of the separate industry forces, there is a need to compile and disseminate accurate and current data, including but not limited to price and utilization data, to meet the needs of the people of Oregon and improve the appropriate usage of health care services.

"(5) It is the purpose of this chapter to establish area-wide and state planning for health services, staff and facilities in light of the findings of subsection (1) of this section and in furtherance of health planning policies of this state.

"(6) It is further declared that hospital costs should be contained through improved competition between hospitals and improved competition between insurers and through financial incentives on behalf of providers, insurers and consumers to contain costs. As a safety net, it is the intent of the Legislative Assembly to monitor hospital performance during the 1985-1987 biennnium so that controls over hospital operating and capital expenditures can be established in the event that competition-oriented methods do not adequately contain costs and the access of Oregonians to adequate hospital care becomes jeopardized because of unaffordable costs." ORS 442.025.

Subsection (5), calling for the planning of health facilities, was in the act as originally adopted in 1977. The 1985 legislature added subsections (4) and (6). Or Laws 1985, ch 747, § 1. OEA argues from that fact that the legislature has made competition the primary method of resolving the problems it identified. OEA ignores, first, the legislature's retention of subsection (5) with its emphasis on planning. It ignores, secondly, that subsection (6) speaks of improved competition *between hospitals* and *between insurers,* not of improved competition in general.[5] As OEA argues vigorously in other contexts, its proposed ASC is not a hospital.

---

[5] These purposes are consistent with the congressional concern that widespread payment by insurers rather than consumers was one of the major obstacles to effective competition. *See* H.R. Rep. No. 190, 96th Cong, 1st Sess (1979), 51-52.

Finally, OEA ignores that there are methods of promoting competition other than bringing in new competitors and that there are factors that impede competition other than inadequate capacity. Increased information about facilities and prices and increased advertising by hospitals and other existing health care institutions are obvious ways of increasing price competition. Subsection (4) appears to have been drafted, in part, to encourage that kind of competition. Other portions of the 1985 act also seem to have that goal. *See, e.g.,* Or Laws 1985, ch 747, § 5 (amending ORS 442.045 to require the Oregon Health Council to act as a statewide data clearing house) and § 6 (amending ORS 442.155 to require health system agencies to serve as clearing houses for information on the enhancement of competition in the health care market place). As we discuss below, Congress was also concerned about deterrents to competition other than insufficient competition.

Before 1985, Oregon law required the planning and coordination of health facility construction in order to reduce overall health system costs. The 1985 changes encouraged competition among health care providers as a method of achieving that goal, but they do not suggest that constructing new facilities is the primary method of promoting competition or that competition is now the overriding state policy. Federal law, which is relevant because the state health planning system is, in large part, the result of federal enactments, does not suggest that Congress' intent was significantly different from that of the Oregon legislature.

In 1979, Congress amended the National Health Planning and Resources Development Act (NHPRDA) to adopt as a priority the "strengthing of competitive forces in the health services industry wherever competition and consumer choice can constructively serve, in accordance with subsection (b),[6] to advance the purposes of quality assurance, cost effectiveness, and access." NHPRDA § 1502(a)(17), 42 USC § 300k-2(a)(17). On the basis of that amendment OEA argues that "Congress chose free market economics as policy" to the exclusion of all other policies. It asserts that Congress permitted the allocation of supply only for institutional services (which OEA insists means inpatient hospital services, not

---

[6] We discuss subsection (b) below.

ASCs) and required competition for other services. What Congress actually did is not as simple as OEA would make it.[7]

In the same act in which it amended 42 USC § 300k-2 to add subsection (a)(17), Congress also added subsection (a)(12), which lists "the identification and discontinuance of duplicative or unneeded services and facilities" as another national health priority. It also adopted subsection (b), in which it found that, in certain kinds of services, competitive forces are diminished, primarily because public and private insurance has become the prevailing method of paying for those services. According to the statute, the state agencies which administer the health planning system should allocate the supply of those services which competition will not allocate appropriately and should make decisions which will strengthen competition for services where competition does allocate supply, *consistent with the appropriate regional and state plans.*[8] The statute does not describe all areas in which competition is inadequate, although it does include "inpatient health services and other institutional health services" in that category. 42 USC § 300k-2(b)(2).[9] Rather, as the legislative history makes clear, Congress left the determination of where competition could be encouraged to the state agencies.

The house committee which considered the 1979 amendments to NHPRDA noted in its report that

> "[p]rimarily because of * * * third party reimbursement arrangements, individuals often make decisions regarding their use of institutional health services with almost no regard to the price of the services, and providers make decisions respecting the supply of institutional health services substantially unaffected by the usual financial incentives and risks which exist in other personal service industries."

---

[7] Oregon law explicitly treats ASCs as institutional health services. ORS 442.015(16)(e) includes them in the definition of "health care facility." ORS 442.015(21) provides:

> " '[I]nstitutional health services' means health services provided in or through health care facilities and includes the entities in or through which such services are provided."

[8] Thus Congress treats competition as one method of implementing health facility planning, not as a substitute for it.

[9] ASCs are "institutional health services" under the statute. 42 USC § 300n (5); 42 CFR § 123.401.

It also pointed out that "the predominant role of the physician in making purchasing decisions on behalf of the patient" limited competition among facilities. H.R. Rep. No. 190, *supra* n 5, at 52. When Congress acted, it appears that it did not believe that there was competition among institutional health services. If, however, there was discovered some way to develop competition, Congress wished to encourage it. If new financing arrangements were developed which would *both* create incentives for patients to respond to prices charged *and* would place providers at financial risk for excess capacity, Congress expected agencies to take that fact into account in making their decisions. H.R. Rep. No. 190, *supra* n 5, at 53-54. Determining whether the requisite circumstances exist and how to take competition into account in a particular case are the agency's responsibility.

■     Both federal and state law, thus, treat competition as *one* method by which to achieve the goal of quality care at reasonable cost, and both place the responsibility on SHPDA to determine the extent to which competition is appropriate in each situation. Neither makes competition the sole criterion for SHPDA to consider. In this light, OEA's assignment of error is simply an assertion that SHPDA did not adequately consider competition in deciding to deny the OEA application. Although the record indicates that ASCs are a recent development with a significant potential to reduce surgical costs, we do not see any basis for holding that SHPDA must evaluate OEA's proposal differently from how it evaluates proposals for other institutional services simply because it is for an ASC. The same criteria apply, with the nature of the proposal being one of the factors SHPDA must consider.

■     OEA's position is that the proposed ASC will promote competition, because Medicare will pay a fixed amount per patient, rather than reimbursing services on a cost basis.[10] Thus, OEA will be at risk for excess capacity. Because OEA intends to charge less than SHGH charges for the use of its SSU, and considerably less than another local hospital charges for its facilities, the ASC will, according to OEA, make

---

[10] Most of the surgery to be performed in the ASC will be cataract surgery, and most of the patients will be covered by Medicare. Medicare's method of payment will therefore be of major significance for the ASC's financial success.

a major contribution to keeping prices down. The law therefore required SHPDA to rely on market forces rather than regulation to control costs to the public. We believe that SHPDA's responsibility was to consider all the relevant criteria rather than relying solely on a single criterion.

In its order, SHPDA carefully considered all the statutory factors, including the effect that the OEA proposal would have on competition for outpatient eye surgery. In that respect it found that there was a significant surplus of facilities in the area and that so high a percentage of eye surgery was performed on an outpatient basis that a new facility was unlikely to produce a significant increase.[11] There is substantial evidence in the record to support those findings. SHGH's facilities are not fully used, and the Northwest Eye Center (NEC), an existing ASC, has two operating rooms which are idle four working days a week. OEA's physicians refuse to use NEC, although it has been recently remodeled to eliminate the major architectural problems which were the basis for many of their complaints.

SHPDA found that the competitive pressure that NEC provided, despite its underutilization, was a major factor in SHGH's recent change in its method of billing Medicare patients, a change which eliminated out-of-pocket costs for most of them.[12] SHPDA also found that OEA had overstated its probable volume and underestimated its costs, making its financial viability questionable. By withdrawing a significant

---

[11] SHPDA's order contains a separate section of findings of facts. SHPDA found some additional facts in the course of discussing the reasons for its decision. We will accept those additional findings if they are clearly stated and are either unchallenged or, if challenged, are supported by substantial evidence. However, it is preferable that an agency place all of its factual findings in one section rather than scattering them throughout its order.

[12] OEA's members, and apparently other Eugene ophthalmologists, refuse to use NEC because of personal and professional disagreements with its owner. SHPDA did not have to take that refusal into account in determining if there were sufficient competitive pressures in the market. A physician's refusal to use a particular facility is precisely the kind of physician, rather than patient, choice among providers which Congress identified as one reason for the lack of competition for institutional health services. Its existence here indicates that ASCs do not meet the criteria which the Congressional committee identified for determining when competition could be the primary method of allocating resources. If groups of physicians, by refusing to use existing facilities, can require SHPDA to issue a certificate for an otherwise unnecessary facility, they will have effectively destroyed the legislature's and Congress' purposes in enacting the health planning acts.

patient load from the SSU, it would increase SHGH's costs. The net effect, SHPDA found, was that the proposed ASC would represent a substantial loss to the community.

SHPDA's order is a carefully reasoned evaluation of the evidence and considers the statutory factors. It explains the agency's action. Its essential findings of fact are, if challenged, supported by substantial evidence.[13] OEA's attack on the order is primarily a disagreement with SHPDA's view of the law. Because we have held that SHPDA's view is essentially correct, there is no basis for us to reverse the order.[14] In the light of our decision, SHGH's cross-petition is moot.

Affirmed on review and on cross-review.

---

[13] OEA argues that some findings are not supported by substantial evidence, in part because SHPDA disagreed with the hearings officer. The hearings officer's ability to observe the witnesses is not a factor in evaluating any of the challenged evidence; SHPDA's disagreement with him therefore does not bring its findings into question.

[14] SHPDA has adequately explained why it denied this application despite its stated support for ASCs generally and its favorable action on other ASC proposals. ORS 183.482(8)(b)(B). OEA has not made its case on its claim of disparate treatment.