ARMSTRONG, P. J.
*311 Wal-Mart Stores, Inc. (Walmart), sought to open a store in The Dalles on a site next to Chenoweth Creek, near the Columbia River. The site has wetlands dispersed across it. As relevant here, to facilitate the construction of a store, Walmart sought a joint permit from the Oregon Department of State Lands (DSL) and the U. S. Army Corps of Engineers to fill and remove some of the wetlands. DSL issued its permit, which required mitigation of the effects that the fill and removal of wetlands would have on the waters of the state. At the time that it issued the permit, DSL found that it was inconclusive whether the project would serve a public need or confer a public benefit. After subsequent administrative proceedings, DSL issued a final order granting the fill and removal permit. Petitioner seeks judicial review of that order, raising three assignments of error that, in essence, raise two issues, reprising arguments that it made below. We address only the first assignment of error. In that assignment, petitioner contends that, under ORS 196.825, a permit to fill or remove wetlands cannot be issued without an affirmative finding by DSL that the project for which the permit is sought will serve a public need. Because DSL found that it was inconclusive whether the project would serve a public need, petitioner contends that DSL lacked authority to issue the wetland fill and removal permit.[1] For the reasons that follow, we agree with petitioner and, accordingly, reverse and remand.
Walmart sought to construct a store in The Dalles. After evaluating a number of locations, *365 Walmart selected a site next to Chenoweth Creek and near the Columbia River. The site is approximately 66 acres in size, 2.17 acres of which is comprised of wetlands, several of which are vernal pools in which a rare species of shrimp live. DSL issued Walmart a wetland fill and removal permit for the site that included *312 mitigation requirements and that made findings about the project, including:
"The record is inconclusive with regard to whether the project, for which the fill or removal is proposed, will address a public need . While there may be a market demand for the products and services offered by Walmart, the desire of Walmart to enter the market does not necessarily constitute a public need. As with many commercial endeavors that don't address a public need, this consideration was not a factor in support of this affirmative determination.
"Likewise, the record is inconclusive regarding the social, economic or other public benefits that may result from the proposed project. The record shows a short-term economic benefit derived from project and infrastructure construction. However, as to long-term net economic benefit to the public from the development of this retail project, the information in the record is inconclusive. Overall, this consideration was not a factor in support of this affirmative determination.
"* * * * *
"While the record is inconclusive with respect to public need, public benefits, and economic costs to the public if the fill or removal is not accomplished, the applicant's alternative analyses were persuasive and the impacts to waters of the state were minimized to the extent practicable and will be mitigated.
"* * * * *
"The proposed fill or removal conforms to sound polices of conservation through avoidance and minimization of impacts and the applicant is providing sufficient mitigation."
(Emphases added.)
Petitioner filed a notice of appeal to the permit and, later, a supplemental notice of appeal, requesting a contested case hearing and raising, among other things, the contention that Walmart had failed to meet its burden to demonstrate that the project would fulfill a public need. Petitioner moved for summary determination in its favor, contending that the wetland fill and removal permit statute, ORS 196.825, as construed by the Oregon Supreme Court *313 in Morse v. Oregon Division of State Lands , 285 Or. 197, 590 P.2d 709 (1979), required DSL to make an affirmative finding that the project would serve a public need for DSL to be authorized to issue the permit. The ALJ disagreed with petitioner's construction of ORS 196.825 and denied its motion for summary determination. After a contested case hearing, the ALJ issued a proposed order granting the wetland fill and removal permit. Petitioner filed exceptions to the proposed order, raising, among others, the same contention that it had raised in its motion for summary determination, viz. , that DSL lacked authority to issue the permit absent a finding of public need. DSL rejected petitioner's contentions and issued a final order granting the permit.
Petitioner seeks judicial review of the final order, contending that the statutes governing fill and removal permits require DSL to make a finding that the project serves a public need for DSL to issue a permit to fill or remove wetlands. Petitioner contends that, without such a finding, DSL lacked authority to grant the permit.
We begin with the relevant statutes. ORS 196.825 provides, in part:
"(1) The Director of the Department of State Lands shall issue a permit applied for under ORS 196.815 if the director determines that the project described in the application:
"(a) Is consistent with the protection, conservation and best use of the water resources of this state as specified in ORS 196.600 to 196.905 ; and
"(b) Would not unreasonably interfere with the paramount policy of this state to preserve the use of its waters for navigation, fishing and public recreation.
"* * * * *
*366 "(3) In determining whether to issue a permit, the director shall consider all of the following:
"(a) The public need for the proposed fill or removal and the social, economic or other public benefits likely to result from the proposed fill or removal. When the applicant for a permit is a public body, the director may accept and rely *314 upon the public body's findings as to local public need and local public benefit."
(Emphases added.)
The legislature has also described the policy of the state regarding its water resources as follows:
"The protection, conservation and best use of the water resources of this state are matters of the utmost public concern . Streams, lakes, bays, estuaries and other bodies of water in this state, including not only water and materials for domestic, agricultural and industrial use but also habitats and spawning areas for fish, avenues for transportation and sites for commerce and public recreation, are vital to the economy and well-being of this state and its people. Unregulated removal of material from the beds and banks of the waters of this state may create hazards to the health, safety and welfare of the people of this state. Unregulated filling in the waters of this state for any purpose, may result in interfering with or injuring public navigation, fishery and recreational uses of the waters. In order to provide for the best possible use of the water resources of this state, it is desirable to centralize authority in the Director of the Department of State Lands, and implement control of the removal of material from the beds and banks or filling of the waters of this state."
ORS 196.805(1) (emphasis added).
As we will explain, the dispute in this case turns on the extent to which the Supreme Court's construction in Morse of a prior version of ORS 196.825 controls the construction of the current version of the statute. Petitioner contends that Morse still controls because, although the statute has been amended since Morse , the legislature did not intend to alter the conclusion in Morse that the statute requires DSL to find a public need for a proposed project to grant a permit for it. DSL disagrees and contends that the plain text of ORS 196.825 demonstrates that Morse no longer bears on the construction of the statute because ORS 196.825 requires DSL only to consider the public need for a proposed project. Because its findings demonstrate that it did consider the public need for the project, DSL asserts that it satisfied the requirements of ORS 196.825.
*315 We begin with Morse , in which the Supreme Court analyzed, among other things, the extent of DSL's statutory authority to issue fill and removal permits. Morse began by analyzing the statutory policy in former ORS 541.610 (1977), renumbered as ORS 196.805 (1989).[2] It then turned to the statute that listed the considerations that DSL must address before issuing a permit. That statute provided, in part:
"(2) The Director of the Division of State Lands may issue a permit applied for under ORS 541.620 for filling waters of this state. In determining whether or not a permit shall be issued, the director shall consider the following :
"(a) Whether the proposed fill unreasonably interferes with the paramount policy of this state to preserve the use of its *367 waters for navigation, fishing and public recreation ;
"(b) Whether the proposed fill conforms to sound policies of conservation and would not interfere with public health and safety;
"(c) Whether the proposed fill is in conformance with existing public uses of the waters[.]"
Former ORS 541.625(2) (1977), renumbered as ORS 196.825 (1989) (emphases added). Thus, former ORS 541.625(2) (1977) required DSL to consider whether a proposed fill unreasonably interfered with the policy of the state to preserve and protect water resources. Harmonizing the statutory policy in former ORS 541.610 (1977) with former ORS 541.625(2) (1977), the Morse court concluded that the legislature intended to require a "weighing process * * * with any *316 doubt always being cast on the side of preservation." 285 Or. at 206, 590 P.2d 709. Finally, the court concluded that, "[i]n the absence of a finding that the public need predominates, there is no basis for the issuance of the permit." Id. at 209, 590 P.2d 709.
After Morse , the legislature amended the fill and removal statute. As noted, the 1977 version of the fill and removal statute required DSL to consider "whether the proposed fill unreasonably interferes with the paramount policy of this state to preserve the use of its waters for navigation, fishing and public recreation." Former ORS 541.625 (2)(a) (1977). In 1979, the legislature changed that language to read:
"(2) The director shall issue a permit applied for under ORS 541.620 for filling waters of this state if he determines that the proposed fill would not unreasonably interfere with the paramount policy of this state to preserve use of its waters for navigation, fishing and public recreation. In determining whether or not a permit shall be issued, the director shall consider the following:
"(a) The public need for the proposed fill and the social, economic or other public benefits likely to result from the proposed fill."
Former ORS 541.625(2) (1979).
Unlike the 1977 version of the statute, former ORS 541.625(2) (1979) required DSL to determine, rather than to consider, that the fill would not unreasonably interfere with the policy of the state to preserve its water resources. It also added the requirement that DSL consider the public need for the proposed fill and the likely social, economic, and public benefits resulting from it.
The legislative history indicates that the legislature was told that the 1979 revisions would codify Morse . The chair of the House subcommittee responsible for the bill stated that the bill was an "attempt to protect those resources [of the state]," and that his "intent [was] to try to just follow along with the [ Morse ] court case and put those standards [into] law." Tape Recording, House Legislative Committee on Trade and Economic Development, Subcommittee on H.B. 2507, H.B. 2619 and H.B. 2620, May 11, 1979, Tape 1, Side 2 *317 (statement of Rep. Ed "Doc" Stevenson). At a later hearing, the chair reiterated that intention:
"What we attempted to do here was to basically put into law what the finding of the court was in the Morse case. I think this is probably a philosophical thing. * * * We attempted to put into the statute what the court determined at this time and to make it clear that that was the law henceforth. * * * We just adopted what the court had said was the law."
Tape recording, House Legislative Committee on Trade and Economic Development, H.B. 2619, May 23, 1979, Tape 12, Side 1 (statement of Rep. Ed "Doc" Stevenson). Similarly, a staff member of the House committee that considered the 1979 revisions explained to the Senate committee the effect of the revisions:
"That [section is] dealing with the Supreme Court case, Morse v. Division of State Lands . * * * The Supreme Court identified that the legislature had intended to allow for some interference with the paramount policy of the use of the waters of the state as long as it-and it could be for non-water-related uses-as long as the director had weighed the extent of the public need for that fill against the interference of the water or non-water use. We have essentially in [that part of the bill]
*368 identified what the Supreme Court had said: that is, the public need for the fill, the social and economic and other public benefits likely to result from the proposed fill when the director is issuing his permit. He has got to balance [subsections] (a) through (e). [Subsection] (e) is not referred to in the Supreme Court case, but we added it because of a problem that occurs in eastern Oregon. * * * Balancing [subsections] (a) through (e) against the paramount policy of the state."
Tape Recording, Senate Legislative Committee on Trade and Economic Development, H.B. 2619, June 19, 1979, Tape 35, Side 2 (statement of Patricia Middelburg).
Thus, the legislative history demonstrates that the legislature intended to codify Morse 's construction of the statute, which required DSL to find that the public need predominates over the loss to the waters of the state caused by the proposed project.
Our conclusion about the import of the 1979 amendments is confirmed by our subsequent decision in *318 1000Friends v. Div. of State Lands , 46 Or. App. 425, 611 P.2d 1177, rev. den. , 289 Or. 588 (1980). There, a landowner built a dike and roadway across a tidal slough to gain access to his residence. Id. at 427, 611 P.2d 1177. After the landowner built the dike, another party filed a complaint about it, and the landowner sought a retroactive permit for it, which DSL granted. Id. We reviewed the final order granting the fill and removal permit. We applied the 1979 version of the fill statutes, which, as noted above, provided:
"(2) The director shall issue a permit applied for under ORS 541.620 for filling waters of this state if he determines that the proposed fill would not unreasonably interfere with the paramount policy of this state to preserve the use of its waters for navigation, fishing and public recreation. In determining whether or not a permit shall be issued, the director shall consider the following:
"(a) The public need for the proposed fill and the social, economic or other public benefits likely to result from the proposed fill."
Former ORS 541.625(2)(a) (1979). Relying on Morse 's construction of the statute, we noted that the agency had not found that the project satisfied a public need. 1000 Friends , 46 Or. App. at 429-30. " 'In the absence of a finding that the public need predominates, there is no basis for the issuance of the permit.' " Id. at 430, 611 P.2d 1177 (quoting Morse , 285 Or. at 209, 590 P.2d 709 ). Because the findings made by DSL did not identify a public need for the dike, we reversed the order granting the permit. Id.
The fill and removal permit statute has been amended a number of times since 1979, but the operative language of the 1979 version of the statute and the current version is substantively equivalent. Implicit in the 1000 Friends holding is the conclusion that the 1979 amendments codified the core holding in Morse .
DSL contends that Morse 's requirement-viz. , that DSL must find that a proposed project meets a public need-is limited to estuarine fills because that was the type of fill at issue in Morse . However, the legislature added wetlands to the definition of the waters of the state in 1989. See Or.
*319 Laws 1989, ch. 837, § 4. DSL fails to articulate a persuasive reason that ORS 196.825 would treat wetland and estuarine fills differently when they are both treated the same in the statutory scheme as "waters of the state," and we see no persuasive reason to conclude that it does that. Hence, we reject that argument.
DSL next contends that, notwithstanding Morse , the plain text of ORS 196.825(3)(a) does not require DSL to make a finding of public need. DSL argues that the phrase "shall consider" in ORS 196.825(3) merely requires DSL to evaluate the public need and benefit, under ORS 196.825 (3)(a), but not does not require DSL to find that a proposed project serves a public need. As contextual support for that argument, DSL relies on ORS 196.825(3), specifically ORS 196.825(3)(h), which also requires DSL to consider "[w]hether [a] proposed fill or removal is for streambank protection." DSL contends that the legislature did not intend DSL to issue fill and removal permits only when a proposed project affirmatively is for *369 streambank protection, and, thus, "shall consider" means only that DSL has to evaluate the listed circumstances in ORS 196.825(3) ; it does not mean that DSL has to find that those circumstances exist. DSL also points to ORS 196.825(4), which gives DSL authority to issue a permit for a substantial fill in an estuary "only if the project is for a public use and would satisfy a public need that outweighs harm to navigation, fishery and recreation." DSL contends that ORS 196.825(4) shows that the legislature knows how to require DSL to make a public need finding when it so intends, and, thus, by using "shall consider" in ORS 196.825(3), the legislature intended a lesser requirement than an affirmative finding of public need.
We disagree with DSL's construction of ORS 196.825. DSL's arguments ignore the prior construction of the fill and removal statute in Morse and 1000 Friends . Both cases stand for the proposition that DSL has the authority to issue a fill and removal permit only after DSL concludes that the proposed project does not unreasonably interfere with the paramount policy of the state to preserve the use of its waters. Morse concludes that DSL lacks the authority to issue a permit without a finding that a public need *320 predominates. The current version of the statute, like the prior versions, requires that the proposed fill and removal "not unreasonably interfere with the paramount policy of this state to preserve the use of its waters for navigation, fishing and public recreation." ORS 196.825(1)(b). Nothing in the amendments to the statute or the legislative history of those amendments persuades us that the legislature intended to abrogate that aspect of Morse . To the contrary, as explained above, the legislature intended to codify Morse .
The Supreme Court's recent decision in Coos Waterkeeper v. Port of Coos Bay , 363 Or. 354, 423 P.3d 60 (2018), does not undercut our conclusion about the import of Morse on the construction of ORS 196.825. Coos Waterkeeper involved a challenge to a fill and removal permit issued by DSL for the construction of a new marine terminal in Coos Bay. Id. at 357. The petitioners' principal argument against the issuance of the permit was that DSL had failed to consider the adverse effects that the operation of the terminal would have on the state's water resources. That argument focused, in turn, on the meaning of the statutory term "project" in ORS 196.825, which the legislature had added to the statute in a 2010 revision of it. Relying on Morse , the petitioners argued for an expansive construction of that term to require DSL to consider both adverse and beneficial effects from the operation of the terminal in deciding whether to grant a permit for it. Id. at 370.
The Supreme Court rejected the petitioners' reliance on Morse as support for their argument on the meaning of "project" in the statute. Id. at 370. The court reasoned that the legislature had amended the statute since the decision in Morse in ways that undercut the petitioners' contention that the adverse operational effects of a project had to be considered along with its beneficial operational effects to determine whether the project served a public need:
"For example, in the next legislative session [after Morse ], the representative for the Coos Bay area introduced H.B. 2985 (1981) with the purpose of increasing the emphasis given to economic factors in the permitting process. Ultimately, that bill added three factors to the list of criteria, including 'the economic cost to the public if the proposed fill [or removal] is not accomplished.'
*321 "The addition of that provision is just one of the changes made to the statute after this court interpreted it in Morse . The 1981 amendment and others substantially changed the text of the statute that addresses whether and how economic effects figure into the analysis. For those reasons, petitioners cannot rely on Morse to understand the legislative intent underlying the 2010 statute."
Coos Waterkeeper , 363 Or. at 371, 423 P.3d 60.
The court's conclusion in Coos Waterkeeper that Morse does not bear on the construction of the term "project" in ORS 196.825 does not affect the core principle recognized in Morse and codified by the legislature in 1979, which requires DSL to find that the public *370 need for a proposed project predominates before DSL has the authority to issue a wetland fill and removal permit for the project. Because DSL found that it was inconclusive whether the project would address a public need, DSL lacked authority to issue the permit. Hence, DSL erred by granting the permit.
Reversed and remanded.

Petitioner also contends in its second and third assignments of error that DSL failed to employ the appropriate analysis to consider alternative designs for the proposed Walmart store. Specifically, petitioner contends that Walmart failed to submit a design plan for the Chenoweth Creek site that had no effect on wetlands. Our resolution of the first assignment of error obviates the need for us to resolve the second and third assignments.

Former ORS 541.610(1) (1977) provided:
"The protection, conservation and best use of the water resources of this state are matters of the utmost public concern. Streams, lakes and other bodies of water in this state, including not only water and materials for domestic, agricultural and industrial use but also habitats and spawning areas for game and food fish, avenues for transportation and sites for public recreation, are vital to the economy and well-being of this state and its people. Unregulated removal of material from the beds and banks of the waters of this state may create hazards to the health, safety and welfare of the people of this state. Unregulated filling in the waters of this state may result in interfering with or injuring public navigation, fishery and recreational uses of the waters. In order to provide for the best possible use of the water resources of this state, it is desirable to centralize authority in the Director of the Division of State Lands, and implement control of the removal of material from the beds and banks or filling of the waters of this state."