Argued and submitted November 14, 2019; decision of Court of Appeals affirmed, final order of the Department of State Lands reversed, and case remanded to Department of State Lands for further proceedings April 16, 2020

# CITIZENS FOR RESPONSIBLE DEVELOPMENT IN THE DALLES,
*Respondent on Review,*

*v.*

# WAL-MART STORES, INC.,
*Respondent,*

*and*

# DEPARTMENT OF STATE LANDS,
*Petitioner on Review.*

(DSL APP0043798RF) (CA A158346) (SC S066596)

461 P3d 956

The Department of State Lands (DSL), issued a permit, pursuant to ORS 196.825, to Wal-Mart Stores, Inc., to fill and remove wetlands on private property in order to build a new store. Citizens for Responsible Development in The Dalles (Citizens) opposed the project and argued on appeal that DSL erred when it issued the permit because it did not find that there was a "public need" for the project. The Court of Appeals agreed with Citizens and remanded the case to DSL. *Held*: The Court of Appeals erred to the extent that it held that ORS 196.825 requires a finding that a "public need" for the fill or removal project "predominates" over the loss to the waters of the state caused by the project for every approved permit. Rather, ORS 196.825 "requires that, if DSL finds that the proposed fill will 'interfere with the paramount policy of this state to preserve the use of its waters for navigation, fishing and public recreation,' then DSL must determine whether the interference is 'unreasonable' by weighing the interference with public uses for which 'waters of this state' are preserved against" a "list of public-benefit considerations" found in ORS 196.825(3). Under that standard, DSL failed to make a finding necessary to support its ultimate determination that the project will not "unreasonably interfere."

The decision of the Court of Appeals is affirmed. The final order of the Department of State Lands is reversed, and the case is remanded to the Department of State Lands for further proceedings.

En Banc

On review from the Court of Appeals.*

_____

* On judicial review from the Department of State Lands. 295 Or App 310, 433 P3d 364 (2018).

Inge D. Wells, Assistant Attorney General, Salem, argued the cause and filed the briefs for petitioner on review. Also on the briefs were Ellen Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Karl G. Anuta, Law Office of Karl G. Anuta PC, Portland, argued the cause and filed the brief for respondent on review. Also on the briefs was Cary Allen, Portland.

FLYNN, J.

The decision of the Court of Appeals is affirmed. The final order of the Department of State Lands is reversed, and the case is remanded to the Department of State Lands for further proceedings.

**FLYNN, J.**

The Department of State Lands (DSL) issued a permit, pursuant to ORS 196.825, for Wal-Mart Stores, Inc. ("Walmart") to fill and remove some wetlands on private property in order to build a new store in The Dalles. Citizens for Responsible Development in The Dalles (Citizens) opposed the project and appealed the fill permit, arguing that DSL lacked authority to issue the permit because DSL did not find that there was a "public need" for the project. The Court of Appeals agreed with Citizens that DSL erred in issuing the permit "[b]ecause DSL found that it was inconclusive whether the project would address a public need." *Citizens for Resp. Devel. in The Dalles v. Walmart*, 295 Or App 310, 321, 433 P3d 364 (2018). We allowed DSL's petition for review and now affirm the decision of the Court of Appeals to remand the case to DSL, although we disagree with its premise that ORS 196.825 conditions the issuance of every permit on a finding that the proposed project will serve a "public need."

The case requires us to construe ORS 196.825, which specifies that, before DSL issues a permit to fill any "waters of this state"—a term that includes "wetlands"—DSL must determine that the project "[w]ould not unreasonably interfere with the paramount policy of this state to preserve the use of its waters for navigation, fishing and public recreation."[1] ORS 196.800(15); ORS 196.815; ORS 196.825(1). The case also requires us to examine and explain the scope of our holding in *Morse v. Oregon Division of State Lands*, 285 Or 197, 204, 590 P2d 709 (1979), which construed a similar requirement in the 1977 fill-permit statute as meaning that DSL must identify and "weigh the extent of the public need for the fill as compared with the public interest in the preservation of the water" for the specified public uses.

According to the Court of Appeals, "*Morse* conclude[d] that DSL lacks the authority to issue a permit without a finding that a public need predominates," and the current fill statute retains that requirement. 295 Or

---

[1] The same statutory requirements govern DSL permits to "remove material from the bed or banks" of "waters of this state," but the permit at issue here was for "fill." ORS 196.815(1); ORS 196.825(1).

App at 319. But DSL contends that *Morse*'s construction of the fill-permit statute did not extend to permits to fill wetlands on private property and that, as amended following *Morse*, the statute now requires DSL only to "reflect on" or "give thought to" the "public need" for a project. According to DSL, it satisfied that requirement by considering—and finding "inconclusive"—whether there is a "public need" for the project.

We agree with DSL in part. The reasoning of the Court of Appeals overstates the holding of *Morse* and understates the significance of subsequent legislative amendments. On the other hand, the argument advanced by DSL understates the holding of *Morse* and overstates the significance of the subsequent legislative amendments. Properly understood, *Morse* required DSL to determine and weigh the "public need" for a fill project only if the proposed fill would "interfere with" the state's "paramount policy" of preserving its waters for the specified public purposes. Moreover, the legislature has since expanded the categories of public benefit that DSL must consider, so that its finding that the "public need" for Walmart's project is "inconclusive" does not necessarily require DSL to deny the permit. However, we agree with the Court of Appeals that the current fill statute incorporates *Morse*'s core conclusion: DSL's statutory obligation to determine whether a proposed project "unreasonably interferes" with the state's "paramount policy" requires it to weigh any interference against—the now-expanded categories of—public benefit. We also conclude that the legislature has required DSL to conduct that weighing for all "waters of the state," a category that now includes wetlands on private property. Because DSL found that all categories of public benefit from the project were "inconclusive" but failed to find that the project would not "interfere" with the state's "paramount policy," the record does not support its determination that the project will not "unreasonably interfere."

## I.  DISCUSSION

### A.  *Statutory Framework*

Before turning to DSL's grant of the permit in this case, we resolve the parties' dispute regarding the statutory framework that governs DSL's authority to grant fill or

removal permits. The legislature has codified as state policy that

> "[t]he protection, conservation and best use of the water resources of this state are matters of the utmost public concern. Streams, lakes, bays, estuaries and other bodies of water in this state, including not only water and materials for domestic, agricultural and industrial use but also habitats and spawning areas for fish, avenues for transportation and sites for commerce and public recreation, are vital to the economy and well-being of this state and its people."

ORS 196.805(1). In furtherance of that policy, the legislature assigned to DSL authority over "the removal of material from the beds and banks or filling of the waters of this state." *Id*. The term "waters of this state" encompasses all "navigable and nonnavigable bodies of water in this state," and it specifically includes "wetlands." ORS 196.800(15).

DSL is authorized to issue a permit for the fill of or removal from "waters of this state" if it "determines that the project described in the application:

> "(a)   Is consistent with the protection, conservation and best use of the water resources of this state * * *; and
>
> "(b)   Would not unreasonably interfere with the paramount policy of this state to preserve the use of its waters for navigation, fishing and public recreation."

ORS 196.825(1). In addition, the statute lists specific factors that DSL "shall consider" "[i]n determining whether to issue a permit," including as pertinent:

> "(a)   The public need for the proposed fill or removal and the social, economic or other public benefits likely to result from the proposed fill or removal[;] * * * [and]
>
> "(b)   The economic cost to the public if the proposed fill or removal is not accomplished."

ORS 196.825(3).[2]

---

[2] The other factors that the statute directs DSL to "consider" are:

> "(c) The availability of alternatives to the project for which the fill or removal is proposed.
>
> "(d) The availability of alternative sites for the proposed fill or removal.
>
> "(e) Whether the proposed fill or removal conforms to sound policies of conservation and would not interfere with public health and safety.

The dispute in this case turns on what the legislature intended to require by the directive that DSL "determine[]" that the proposed project "[w]ould not unreasonably interfere with the paramount policy of this state" by "consider[ing] *** [t]he public need for the proposed fill or removal." ORS 196.825(1), (3). We have frequently reiterated that a court's "paramount goal" in construing a statute is to discern the intention of the legislature. *State v. Gaines*, 346 Or 160, 171, 206 P3d 1042 (2009); ORS 174.020(1)(a). In pursuing that goal, we give primary weight to the text and context of the disputed statutory terms. *Id*. Our understanding of the intended meaning of a statute "is also informed by this court's prior construction of that statute or its predecessors." *State v. Cloutier*, 351 Or 68, 100, 261 P3d 1234 (2011) (citation omitted); *see also Blacknall v. Board of Parole*, 348 Or 131, 142, 229 P3d 595 (2010) (prior cases supply context and "may illuminate or explain the meaning of the statutory text").

We begin our statutory analysis with this court's decision in *Morse*, which construed the "not unreasonably interfere" requirement that the current statute retains. At the time of our decision in *Morse*, the requirements for DSL to issue a permit to fill or to remove material from the "waters of this state" were set out in *former* ORS 541.625(2) (1977), which provided, in pertinent part, that

"[t]he Director of the Division of State Lands may issue a permit applied for under ORS 541.620 for filling waters of

---

"(f) Whether the proposed fill or removal is in conformance with existing public uses of the waters and with uses designated for adjacent land in an acknowledged comprehensive plan and land use regulations.

"(g) Whether the proposed fill or removal is compatible with the acknowledged comprehensive plan and land use regulations for the area where the proposed fill or removal is to take place or can be conditioned on a future local approval to meet this criterion.

"(h) Whether the proposed fill or removal is for streambank protection.

"(i) Whether the applicant has provided all practicable mitigation to reduce the adverse effects of the proposed fill or removal in the manner set forth in ORS 196.800. In determining whether the applicant has provided all practicable mitigation, the director shall consider the findings regarding wetlands set forth in ORS 196.668 and whether the proposed mitigation advances the policy objectives for the protection of wetlands set forth in ORS 196.672."

ORS 196.825(3).

this state. *In determining whether or not a permit shall be issued, the director shall consider* the following:

"(a)   *Whether the proposed fill unreasonably interferes with the paramount policy of this state* to preserve the use of its waters for navigation, fishing and public recreation[.]"[3]

*Former* ORS 541.625(2) (1977) (emphases added).[4]

The dispute in *Morse* arose out of a permit that DSL had issued to the City of North Bend to fill 32 acres of a Coos Bay estuary to make possible an extended runway for the city's municipal airport. In approving the permit application in *Morse*, DSL had found that the fill would displace clams and other organisms and "would eliminate some casual navigation of the recreational kind." 285 Or at 200. DSL had approved the permit but had required the city to take certain actions to mitigate those harms. The petitioner challenged the permit on appeal, and this court ultimately allowed review. The statutory dispute in *Morse* focused on the meaning of the requirement that "[i]n determining whether or not a permit shall be issued, the director shall consider * * * [w]hether the proposed fill unreasonably interferes with the paramount policy of this state to preserve the use of its waters for navigation, fishing and public recreation[.]" *Former* ORS 541.625(2)(a) (1977). This court construed that statutory requirement and ultimately concluded that DSL lacked statutory authority to issue the particular permit because DSL "failed to make any ultimate finding of fact that the public need for the airport extension outweighed the detriment to" the water-related uses specified in the statute. 285 Or at 209. That ultimate holding led the Court of Appeals to characterize *Morse* as concluding "that DSL lacks the authority to issue a permit without a finding that a public need predominates." 295 Or App at 319.

We agree with DSL, however, that the Court of Appeals overstated the holding of *Morse*. Properly understood, our decision in *Morse* is divided into two distinct sections: analysis and conclusions about the meaning of

---

[3] The 1977 statute separately listed requirements for issuing permits "to remove material from the beds or banks of any waters of this state" in *former* ORS 541.625(1) (1977).

[4] *Former* ORS 541.625 (1977) was renumbered to ORS 196.825 in 1989.

the statute, followed by an application of the statute to conclude that DSL lacked authority to issue the particular permit at issue in *Morse*. *Morse* first engaged in an exercise of statutory construction to determine what the legislature intended by the requirement that DSL consider "[w]hether the proposed fill unreasonably interferes with the paramount policy of this state." 285 Or at 205 (emphasis omitted). Preliminarily, the opinion concluded that the legislature intended the "unreasonably interferes" standard to govern all categories of fills in waters of the state, including fills for purposes that were not water-related—like the airport extension. *Id*. The opinion then held that the legislature intended DSL to determine whether "interference" is "unreasonable" by "weighing the extent of the public need for the fill against the interference with the ['paramount policy of this state to preserve the use of its waters for the'] named water-related uses." *Id*. The opinion explained that "[w]hether or not the interference with water-related uses is unreasonable necessarily depends upon the extent of public need for the use which so interferes." *Id*. As that discussion makes clear, *Morse* identified DSL's obligation to identify and weigh "the extent of the public need" as the way that DSL must evaluate fill proposals that would "interfere" with the specified state water policy. *Id*.

   *Morse* then turned briefly to an assessment of the particular permit at issue in the case. As the opinion recited, DSL had found that the particular estuary fill would "displace clams as well as other organisms" and "would eliminate some casual navigation of the recreational kind." *Id*. at 200. In other words, DSL had already determined that the proposed fill of the estuary would cause "interference" with the state's water-related concerns. *See Coos Waterkeeper v. Port of Coos Bay*, 363 Or 354, 370, 423 P3d 60 (2018) (explaining that, "[i]n *Morse*, the purpose of the fill permit was to extend an airport runway into the bay, thus necessarily reducing the extent of state waters and interfering with navigation, fishing, and recreational uses in order to further an entirely nonwater related use").[5] In the context of that particular

---

  [5] In *Coos Waterkeeper*, this court construed the meaning of the term "project," as used in ORS 196.825, and concluded "that the legislature intended 'project' to include fill or removal and construction, but not operations" of the constructed

fill, the opinion concludes that, "[i]n the absence of a finding that the public need predominates, there is no basis for the issuance of *the permit*[.]" 285 Or at 209 (emphasis added).

It was only in the course of the permit-specific assessment that *Morse* referred to a finding of "public need" as necessary, and that holding must be understood in the context of a particular proposed fill that would interfere to some extent with waters of the state. Thus, we agree with DSL that *Morse* did not construe the legislature's phrase "unreasonably interferes" as requiring a finding in every case "that a public need predominates." Rather, *Morse* construed the statute to require that, if the proposed fill "interferes with the paramount policy of this state" within the meaning of the statute, then DSL must engage in a weighing of "the extent of the public need for the fill" to determine whether the interference would be "unreasonable." 285 Or at 205.

However, we agree with the basic premise of the Court of Appeals that, when *Morse* construed DSL's statutory obligation to consider whether a proposed fill "unreasonably interferes," it did so for purposes of all fill permits under *former* ORS 541.625(2) (1977). As explained above, *Morse*'s holding that the legislature intended DSL to determine whether "interference" is "unreasonable" by engaging in a "weighing" was part of the court's analysis of the statute, generally, before the opinion turned to a discussion of the particular permit at issue in the case. 285 Or at 205. *Morse*'s conclusion regarding the meaning of the statutory requirement applied—and continues to apply—to all permits for "filling waters of this state." *Former* ORS 541.625(2) (1977). Then—as now—"waters of this state" encompassed both "navigable and nonnavigable" bodies of water in this state. *Former* ORS 541.605(8) (1977). We, thus, reject DSL's

---

facility. 363 Or at 364. In the course of reaching that conclusion, we rejected the petitioner's reliance on *Morse* for a very different proposition than that at issue here—an argument that *Morse* requires "scrutiny of 'the need for, and impacts of, the underlying project as a whole.'" *Id.* at 369. We made the statement that the statutory amendments after *Morse* "undercut petitioners' argument." *Id.* at 370. Although DSL reads that comment as a broad conclusion that *Morse* was "undercut" by the subsequent amendments, that was not the point of our comment.

proposal that *Morse*'s construction of what it means for "interference" to be "unreasonable" addressed only permits for fills in the kind of tidal, navigable water that was at issue in *Morse*.

Our construction of the statute in *Morse* significantly informs our understanding of the statutory amendments that followed. Immediately after we issued our decision in *Morse*, the 1979 legislature began considering, and ultimately approved, a bill to amend the fill-permit statute. That new legislation, House Bill (HB) 2619 (1979), changed the permit statute in three ways that are significant to the dispute in this case, and those changes suggest—as the Court of Appeals reasoned—that the amendments primarily were "intended to codify *Morse*'s construction of the statute[.]"[6] *Citizens*, 295 Or App at 317.

First, the 1979 legislature converted the 1977 instruction that DSL "consider *** [w]hether the proposed fill unreasonably interferes with the paramount policy of this state to preserve the use of its waters for navigation, fishing and public recreation" to a requirement that DSL "shall" issue a permit if the director "determines that the proposed fills would not unreasonably interfere with the paramount policy of this state to preserve the use of its waters for navigation, fishing and recreation." Or Laws 1979, ch 564, § 3a. That change modifies the statutory structure in a way that appears to more closely capture *Morse*'s conclusion that the legislature has authorized DSL to issue permits for some fills that will interfere with the preservation of the state's waters as long as DSL *determines* that the fill will not "unreasonably interfere" with the state's paramount purpose.

Second, the 1979 legislature added two new factors that "the director shall consider" in determining whether to issue a permit: "(a) The public need for the proposed fill and the social, economic or other public benefits likely to

---

[6] The 1979 legislature made other changes to *former* ORS 541.625 that are not pertinent to our inquiry in this case, including an entirely new section directing DSL to "require mitigation as a condition of any permit for filling or removal of material from an intertidal or tidal marsh area of an estuary." *See* Or Laws 1979, ch 564, §§ 1, 5; *see also former* ORS 541.626 (1979) (mitigation provision).

result from the proposed fill"[7] and "(e) Whether the proposed fill is for streambank protection." *Id*. The first addition expressly captures *Morse*'s conclusion that DSL must make the "unreasonable interference" determination by weighing "public need for the fill" against any interference with the public uses for which the water is to be preserved. 285 Or at 205. The second addition captures a regional consideration, as we will explain when we describe the legislative history.

Finally, the 1979 legislature added an entirely new provision that specifically addressed permits for a fill in an estuary for a "nonwater dependent use." Or Laws 1979, ch 564, § 3a. That change preserves and cabins the specific holding of the *Morse* majority by specifying that DSL is permitted to issue "a permit for a substantial fill in an estuary for a nonwater dependent use," but "only if the fill is for a public use and would satisfy a public need that outweighs harm to navigation, fishery and recreation and if the proposed fill meets all other criteria contained in [the statutes governing fills]."[8] *Id*.

Legislative history confirms that the 1979 legislature intended to codify those aspects of our decision in *Morse*, although, as we discuss below, it made other substantive changes as well.[9] Representative Ed Stevenson, the chair of the house subcommittee responsible for the bill, explained that, with respect to the changes to *former* ORS 541.625(2) (1977), "[w]hat we attempted to do here was to basically put into law what the finding of the court was in the *Morse* case." Tape Recording, House Legislative Committee on Trade and Economic Development, HB 2619, May 23, 1979, Tape 12, Side 1 (statement of Rep Ed Stevenson). He continued, explaining that "[w]e attempted to put into the statute what

---

[7] Paragraph (a) also specifies that "[w]hen the applicant for a fill permit is a public body, the director may accept and rely upon the public body's findings as to local public need and local public benefit." *Id*.

[8] The circumstance of a "public use" for the proposed fill was important to the decision in *Morse* because the estuary was a body of water subject to the public trust doctrine, which limits the government's ability to impair the public's interest in the water. 285 Or at 201.

[9] We explained in *Gaines* that we consider legislative history "'for what it's worth.'" 346 Or at 171. The legislative history of the 1979 amendments provides significant insight into the legislature's intention.

the court determined at this time and to make it clear that that was the law henceforth. \*\*\* We just adopted what the court had said was the law." *Id*.

Later, the senate committee that considered the bill was given a similar explanation by committee staff—that the amendments to *former* ORS 541.625 (1977) were "'dealing with'" this court's decision in *Morse* and that

> "'[w]e have essentially in [that part of the bill] identified what the Supreme Court had said: that is, the public need for the fill, the social and economic and other public benefits likely to result from the proposed fill when the director is issuing his permit. [The Director] has got to balance [subsections] (a) through (e).'"

*Citizens*, 295 Or App at 317 (quoting Tape Recording, Senate Legislative Committee on Trade and Economic Development, HB 2619, June 19, 1979, Tape 35, Side 2 (statement of Patricia Middelburg)). Committee Executive Officer Middelburg also explained that subsection (e), which requires consideration of "'[w]hether the proposed fill is for streambank protection,'" "'is not referred to in the Supreme Court case, but we added it because of a problem that occurs in eastern Oregon.'" *Id*.

The statutory context and legislative history persuade us that DSL overestimates the significance of the legislature's post-*Morse* statutory amendments when it contends that the legislature merely intended for DSL to "reflect on" or "give thought to" the "public need" for a project that will interfere with "the paramount policy of this state to preserve the use of its waters for navigation, fishing and public recreation." DSL points to two aspects of the 1979 amendments to support its construction, but neither is persuasive.

DSL first focuses on the text of ORS 196.825(3), which directs DSL to "consider" the "public need" for or "public benefit" from "the proposed fill or removal," in addition to the other listed factors. Relying on a dictionary definition, DSL asserts that the ordinary meaning of "consider" is "to reflect on : think about with a degree of care or caution \*\*\* to give thought to with a view to purchasing, accepting, or adopting." *Webster's Third New Int'l Dictionary* 483

(unabridged ed 2002). Given that ordinary meaning, DSL reasons that it is only required to "reflect on" or "give thought to" the public need and benefit of the fill or removal, it is not required to make an affirmative finding that the project will serve a public need and have public benefit before issuing a permit. DSL adds that requiring such an affirmative determination of public need would require that DSL "find" that factor, instead of "consider" it, which would be "grammatically untenable in the context of the statute as a whole."

We have emphasized, however, that "[i]n construing statutes, we do not simply consult dictionaries and interpret words in a vacuum" because dictionaries "do not tell us what words mean, only what words *can* mean, depending on their context and the particular manner in which they are used." *Cloutier*, 351 Or at 96 (emphasis in original; citation omitted). DSL's citation to a dictionary definition is not sufficient to persuade us that the legislature intended to create a different requirement for permits than that identified by the context and legislative history discussed above.

We emphasize that the phrase "the director shall consider" was not new to the statute in 1979. The version of the statute that this court construed in *Morse* also used the phrase "the director shall consider" to introduce a list of factors that included "[w]hether the proposed fill unreasonably interferes" with the state's paramount policy. *Former* ORS 541.625 (1977). Yet we discerned in that phrase a legislative intention to require that DSL "determine[]" whether "interference with water-related uses is unreasonable" and to do so "by weighing the extent of the public need for the fill against the interference with the named water-related uses." *Morse*, 285 Or at 205. As we have concluded, the current statute retains that requirement—albeit with an expanded category of "public" considerations.

DSL next argues that, by adding a specific requirement that DSL find "a public need that outweighs harm" for a "substantial fill in an estuary for a nonwater dependent use," the 1979 legislature signaled—through contrast—its intention that DSL never needs to do more than "reflect on" or "think about" public need when the permit proposes to fill a different body of water. The main problem with that

argument is that the estuary-fill provision requires more than a finding of public need; it also requires that the fill be "for a public use." Thus, the provision clearly affords estuaries extra protection from fills, which *Morse* suggests may be required by the public trust doctrine. But it does not follow that, by granting estuaries that heightened protection, the legislature intended to abrogate *Morse*'s requirement that, for all categories of fills, DSL must weigh the extent of "public need" against "interference with water-related uses" to determine whether the interference is "unreasonable." Indeed, as we have explained, the legislature intended to retain that requirement.

The legislature, however, made one significant change to the rule that we articulated in *Morse*. Although *Morse* construed the statute to require DSL to balance any interference against the "public need" for the project, the 1979 amendments broadened the factors that are part of the "public" side of the weighing. The amendments directed DSL to consider not only the "public need" described in *Morse* but also the "social, economic or other public benefits likely to result from the proposed fill" in determining whether the proposed fill would "unreasonably interfere" with the paramount policy of the state. Or Laws 1979, ch 564, § 3a. In the next session, the legislature again amended the list of factors that DSL must "consider" in issuing a permit to include the "economic cost to the public if the proposed fill is not accomplished." Or Laws 1981, ch 796, § 1. As we explained in *Coos Waterkeeper*, in 1981, "the representative for the Coos Bay area introduced HB 2985 (1981) with the purpose of increasing the emphasis given to economic factors in the permitting process." 363 Or at 371 (citing Exhibit A, Senate Committee on Trade & Economic Development, HB 2985, July 13, 1981 (letter from Rep Bill Grannell)).

Those changes, as well as our clarification of the holding of *Morse*, persuade us that the Court of Appeals overstated the requirements of ORS 196.825 to the extent that it construed the statute to "require[] DSL to find that the public need for a proposed project predominates before DSL has the authority to issue a wetland fill and removal permit for the project." *Citizens*, 295 Or App at 321. Rather, the statute requires that, if DSL finds that the proposed fill will

"interfere with the paramount policy of this state to pre-serve the use of its waters for navigation, fishing and public recreation," then DSL must determine whether the inter-ference is "unreasonable" by weighing the interference with public uses for which "waters of the state" are preserved against the expanded list of public-benefit considerations.[10] Thus, the Court of Appeals erred to the extent that it con-strued ORS 196.825 to require that every permit for fill or removal must be supported by a finding that "public need" for the project "predominates."

B.  *Application of Statutory Standard to the Permit in this Case*

Although DSL views that conclusion as requiring us to reverse the decision of the Court of Appeals, we must engage in further analysis to determine the appropriate dis-position. We have explained that there are two components to the limitation that ORS 196.825(1)(b) places on DSL's authority to issue a permit for fill or removal: either the proj-ect will not interfere with the public uses for which "waters of the state" are preserved, or the interference is "not unrea-sonable" when weighed against the range of public benefits that the legislature has directed DSL to consider. Because DSL's order does not reflect that it found either component to be satisfied, we conclude that the order is not supported by substantial evidence. We thus affirm the ultimate hold-ing of the Court of Appeals that the case must be reversed and remanded to the agency.

To explain that disposition, we turn to the order in this case. Walmart determined that it would need to fill some of the approximately nine acres of wetlands that are scattered across the site on which it proposed to build a store in The Dalles, so it submitted a permit application to DSL pursuant to ORS 196.825. Following a public comment period and an analysis and investigation by agency staff,

---

[10] We understand the legislature to have contemplated a low threshold for "interference." In *Morse*, neither this court nor the agency doubted that the fill would "interfere," although the interference was limited to displacing clams and other organisms and eliminating "some casual navigation of the recreational kind." We understand the legislature to have retained that low threshold with subsequent amendments.

DSL approved the permit.[11] Citizens appealed within the agency, and, following a hearing, DSL ultimately issued a final order from which we take our description of the record.

Scattered throughout the proposed site are forty-nine "emergent wetlands," most of which "are classified as vernal pools and are considered by the Department as wetlands of conservation concern." Several of the wetlands contain a species known as Oregon Fairy Shrimp, which is considered to be "globally vulnerable." Walmart's proposal predicted a "permanent impact" to 2.17 acres of the wetlands on the site, including some that were occupied by fairy shrimp. As mitigation for the permanent impacts to those wetlands, Walmart proposed a combination of restoration, creation, enhancement, and preservation to benefit approximately five acres of other wetlands on the property, many of which "are potential fairy shrimp habitat."

DSL began by discussing each of the factors that ORS 196.825(3) directs it to "consider." With respect to the "public need" and "economic or other public benefits" of the project, DSL observed that Walmart's permit application had claimed that consumers have "a need for low cost goods" that would be better met by the addition of a Walmart store, that the project would bring hundreds of temporary and permanent jobs to the area, and that construction-related activities "would inject over $19 million to the local economy." DSL also observed that Citizens had challenged those claims, asserting that existing area stores could address the asserted consumer need and that the economic benefit for the community that Walmart claimed would be outweighed by the loss to the local economy from future closure of local retailers "and the potential public costs of low wages and minimal benefits of Walmart employees."

---

[11] Once DSL determines that a permit application is complete, it schedules a public comment period. ORS 196.825(6)(a), (8)(a). The applicant is given an opportunity to respond and to modify the application to address issues. OAR 141-085-0550(9); OAR 141-085-0560(5). DSL then reviews the application and comments and may conduct an investigation before determining whether the conditions for issuing a permit are met. OAR 141-085-0560(4); OAR 141-085-0565(1). DSL will prepare written findings to document its decision in several situations, including if the permit is for "[p]ermanent fill of two acres or more in wetlands." OAR 141-085-0565(7).

Although DSL did not specify which of the assertions—if any—it accepted, DSL ultimately found that "[t]he record is inconclusive with regard to whether the project, for which the fill or removal is proposed, will address a public need" and also "is inconclusive regarding the social, economic or other public benefits that may result from the proposed project." In addition, DSL found that the record was "inconclusive" with respect to whether the public would suffer "economic loss" from forgoing the new retail facility for which the fill was proposed.

DSL then determined that the application met both of the requirements for issuing a permit. First DSL concluded that "the project is consistent with the protection, conservation and best use of the water resources of this state," in part because "impacts to waters of the state were minimized to the extent practicable and will be mitigated."[12] *See* ORS 196.825(1)(a). It reasoned that "[t]he creation of new wetlands, restoration of previously filled wetlands and enhancement of existing wetlands provides in-kind functional replacement" and that "[t]he mitigation is expected to maintain or slightly increase habitat for fairy shrimp and related invertebrates." Second, DSL reasoned that the proposed fill-removal would not "unreasonably interfere with the paramount policy of this state" because "[t]he Walmart project is not located on a state owned waterway, and there are no known public fishing or public recreation activities on this site." *See* ORS 196.825(1)(b).

It is the second determination that Citizens challenges as unsupported by the record. As we have explained, there are two ways that a proposed fill or removal can satisfy the requirement that the project will "not unreasonably interfere with the paramount policy of this state." DSL can determine that the project will not "interfere," or DSL can determine that the interference is not "unreasonable"

---

[12] ORS 196.825(5) provides, in relevant part, that, "[i]f the director issues a permit, the director may impose such conditions as the director considers necessary to carry out the purposes of ORS 196.805 and 196.830 and subsection (1) of this section and to provide mitigation for the reasonably expected adverse effects of project development" and the "director shall impose, as conditions to any permit, general authorization or wetland conservation plan, measures to provide mitigation for the reasonably expected adverse effects of project development."

because it is outweighed by the public-benefit considerations. But we do not understand DSL's order to be supported by either determination.

1.  *Whether there is interference*

It appears that the Court of Appeals assumed that DSL had found this project would interfere with the state's paramount policy to preserve waters of the state. That assumption is not unreasonable given the record below. For example, DSL's final order repeatedly refers to "impacts" that the project will have on the waters of the state generally, and on the wetlands in particular. However, DSL's order does not directly address the question of "interference," apart from the conclusion—described above—that the project would not "unreasonably interfere" because of its location. DSL's arguments in this court have clarified that it intentionally skipped the step of determining whether the project would "interfere with the paramount policy of this state" because, as it construes the requirement, filling wetlands on "private land" will never "interfere" with the state's preservation of "waters of the state" for public purposes. According to the position articulated by DSL at oral argument, the requirement of ORS 196.825(1)(b) "applies to state owned land, not to private land." There are both factual and legal obstacles that defeat the argument.

First, DSL's categorical proposition is not factually sustainable because, as DSL acknowledged at oral argument, fill or removal of a private waterway on private land "conceivably" could "impact what happens on a downstream [public] river." Moreover, as our analysis above should indicate, we reject DSL's premise that some categories of permits issued under ORS 196.825 are categorically exempt from the requirement that the fill or removal "not unreasonably interfere with the paramount policy of this state to preserve the use of its waters for navigation, fishing and public recreation." The legislature has retained the construction of the "unreasonable interference" requirement, which we articulated in *Morse*, that *for all projects that would interfere* with "waters of this state," DSL must determine whether the "interference" is "unreasonable" by "weighing the extent of the public need for the fill against the interference with

the named water-related uses." *Morse*, 285 Or at 205. The legislature extended that requirement to permits for the fill of wetlands on private property when it added "wetlands" to the definition of "waters of the state" that are to be preserved. ORS 196.800(15); Or Laws 1989, ch 837, § 4. Indeed, the legislature has adopted an additional, wetland-specific policy, to "[p]romote the protection, conservation and best use of wetland resources, their functions and values," and that policy specifically includes "protection of wetland values on private lands[.]" ORS 196.672(1), (9).[13]

    2.   *Whether interference is "not unreasonabl[e]"*

The Court of Appeals emphasized DSL's finding that the "public need" for the project is "inconclusive." 295 Or App at 321. We have explained that the finding does not necessarily preclude DSL from issuing the permit—even if the project will interfere with the state's paramount policy for water resources—because the legislature has expanded the public-benefit considerations that DSL weighs to determine whether interference is "unreasonable." However, in approving the permit in this case, DSL found all of the identified categories to be "inconclusive." As set out above, DSL found that

- "[t]he record is inconclusive with regard to whether the project, for which the fill or removal is proposed, will address a public need";

- the record "is inconclusive regarding the social, economic or other public benefits that may result from the proposed project"; and

- the record is "inconclusive" with respect to whether the public would suffer "economic loss" from forgoing the new retail facility for which the fill was proposed.

In other words, DSL identified no "weight" to place on the public-benefit side of the balance. Thus, absent a finding that the project will not "interfere" with the "paramount policy of this state to preserve the use of its waters

---

[13] The legislature added "wetlands" to "waters of the state" and also adopted the additional wetlands policy in 1989. Or Laws 1989, ch 837, §§ 3, 4.

for navigation, fishing and public recreation," the record does not support DSL's determination that the project will "not unreasonably interfere." *See* ORS 196.825(1)(b). But, as we have explained, the current record lacks a finding about whether or not the project will "interfere." We thus agree with the Court of Appeals that the agency decision must be reversed and remanded. *See Drew v. PSRB*, 322 Or 491, 500-01, 909 P2d 1211 (1996) ("agency's failure to connect permissibly its facts and its holding is fatal to the agency's order"); *Bergerson v. Salem-Keizer School District*, 341 Or 401, 415, 144 P3d 918 (2006) (quoting *Drew*, 322 Or at 500, and reversing agency decision for failing to provide "the essential linkage" between the facts of the case and its final conclusion).

The decision of the Court of Appeals is affirmed. The final order of the Department of State Lands is reversed, and the case is remanded to the Department of State Lands for further proceedings.